Edward SADLOWSKI, Jr., et al.

v.

UNITED STEELWORKERS OF AMERI-CA, AFL–CIO–CLC, Appellant,

F. Ray Marshall, Secretary of Labor.

Edward SADLOWSKI, Jr., et al., Appellants,

v.

UNITED STEELWORKERS OF AMERI-CA, AFL–CIO–CLC, et al.

Nos. 81–1138, 81–1174.

United States Court of Appeals, District of Columbia Circuit.

Argued March 3, 1981.

Decided March 31, 1981.

As Amended June 1, 1981.

Michael Gottesman, Washington, D. C., with whom Robert M. Weinberg, Gary L. Sasso and David M. Sieberman, Washington, D. C., were on brief, for United Steelworkers of America, AFL–CIO–CLC appellant in No. 81–1138 and appellee in No. 81–1174.

Joseph A. Yablonski, Washington, D. C., with whom Joseph L. Rauh, Jr., John Silard and Daniel B. Edelman, Washington, D. C., were on brief for Sadlowski, Jr., et al., appellees in No. 81–1138 and cross/appellants in No. 81–1174. Charles R. Both, Washington, D. C., also entered an appearance for Sadlowski, Jr., et al., appellees in No. 81–1138 and cross/appellants in No. 81–1174.

Jason Kogan, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty. and Kenneth M. Raisler, Asst. U. S. Atty., Washington, D. C., were on motion for summary affirmance.

Before MacKINNON and ROBB, Circuit Judges and AUBREY E. ROBINSON, Jr.,* United States District Judge for the District of Columbia.

Opinion for the Court filed by Circuit Judge MacKINNON.

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

MacKINNON, Circuit Judge:

The appellees, Sadlowski, Jr., et al., attack Article V, Section 27 of the Constitution of the United Steelworkers of America (Union) which prohibits a candidate for Union office from receiving any campaign contributions from persons who are not members of the Union. In the hotly contested election for International President of the United Steelworkers of America in 1977, Edward Sadlowski, Jr., the defeated candidate, received substantial financial support from nonmembers and made a very substantial run against the candidate supported by the incumbent leadership. Shortly thereafter the Union amended its Constitution in Article V, Section 27 to prohibit absolutely any outside financial contributions. Sadlowski and others then brought this action to invalidate the "outsider" rule, claiming that the rule violated their rights under the First Amendment, the National Labor Relations Act (NLRA), 29 U.S.C. §§ 151–168, and the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. §§ 401–531. On cross-motions for summary judgment the district court held the outsider rule violated rights of union members protected by the right to sue provision in the Bill of Rights for Union members included in the LMRDA, 29 U.S.C. § 411(a)(4), and declared Section 27 invalid in its entirety. The Union filed this appeal and, since the next election for international officers is scheduled for May 28, 1981, the case has been given expedited consideration. We affirm, with one minor exception, the order declaring Article V, Section 27 invalid and enjoining the Union from enforcing it.

## I. BACKGROUND

In the 1977 election for International President of the United Steelworkers of America—which has some 1.3 million members—Edward Sadlowski, Jr., opposed Lloyd McBride in a heated campaign to succeed the retiring I. W. Abel. McBride enjoyed the support of the Union's incumbent leadership; Sadlowski was the insurgent chal-

lenger.[1] Sadlowski received substantial campaign contributions from sources outside the Union, and McBride received most of his financial support from the staff of the Union.

Sadlowski received 249,281 votes to McBride's 328,861 and the other members of his insurgent slate were also defeated. He contested the validity of the election, but the Secretary of Labor refused to initiate legal proceedings to overturn the announced result, and a legal challenge to the Secretary's refusal failed. *See Sadlowski v. Marshall*, 464 F.Supp. 858 (D.D.C.), *aff'd mem.*, No. 79–1461 (D.C.Cir.1979), *cert. denied*, 447 U.S. 905, 100 S.Ct. 2987, 64 L.Ed.2d 854 (1980).

The next biennial convention of the Union in 1978 enacted Article V, Section 27 (set forth as an Appendix to this opinion) as an amendment to the Union Constitution. In addition to imposing a blanket prohibition on campaign contributions by persons other than union members (with an exception for volunteered time), Section 27 empowered the International Executive Board to promulgate implementing regulations and created the Campaign Contribution Administrative Committee "to administer and enforce" the outsider rule. The rule represents the first attempt by an American labor union to so restrict financial support for candidates for union office.[2]

1. Sadlowski was the Director of District 31, the Union's largest. Although he was declared the loser in the 1973 election for district director, the election was invalidated. He won the Department of Labor-supervised rerun by a substantial majority.

2. Note, *Restrictions on "Outsider" Participation in Union Politics*, 55 Chi.-Kent L.Rev. 769, 769 (1979).

3. The other plaintiffs were Joseph Samargia, a potential candidate for Director of District 33; Edward Sadlowski, Sr., a retired union member who supported his son's candidacies in prior elections; Leonard S. Rubenstein, an outside contributor to Sadlowski's 1977 campaign for International President; and James Miller, a Massachusetts lawyer who had been active in the prior campaign. The district court found that Sadlowski, Jr., and Samargia "are eligible to be and may be candidates for [Union] offices which are subject to [the outsider rule]," *Sad-*

Sadlowski and others[3] brought suit in late 1979 to challenge the validity of the outsider rule. The Union and the Secretary of Labor were named as defendants. Plaintiffs complained that the outsider rule violated the First Amendment rights of both members and nonmembers; the National Labor Relations Act since it must be read consonant with the First Amendment; the right to sue provision of the LMRDA; and section 401(g) of the LMRDA, 29 U.S.C. § 481(g), which prohibits candidates for union office from receiving campaign contributions from employers or union funds. After various motions to dismiss and for summary judgment were filed and argued, the district court granted plaintiffs' motion for summary judgment on their right to sue claim and the Secretary's motion to dismiss the case as to him for lack of jurisdiction. Plaintiffs' remaining motions were denied and the Union's remaining countermotions were granted. The Union and the plaintiffs have appealed those parts of the district court's order that were adverse to them.

## II. ANALYSIS

### A. The Right to Sue

The district court held the outsider rule violated section 101(a)(4) of the LMRDA, 29 U.S.C. § 411(a)(4), the so-called

*lowski v. United Steelworkers of America*, 507 F.Supp. at 623 (D.D.C.1981) (findings of fact and conclusions of law); App. at 53, and concluded that they "have 'standing' to challenge [the outsider rule]." *Id.* at 56.

Inasmuch as our disposition of this case requires us only to consider the impact of the outsider rule on protected rights of union members, we are concerned only with the interests of Sadlowski, Jr., and Samargia. The Union has not challenged their standing. We agree with the district court that as potential candidates (or supporters of potential candidates), they have standing to attack the facial validity of the outsider rule. Even if Sadlowski and Samargia were not ultimately candidates they would still have standing since their decision not to run may have resulted from the outsider rule's limitation on their ability to raise money. *See* Plaintiff's Reply to Defendant's Statement of Genuine Issues at 43, Plaintiff's Brief (app.).

right to sue provision. The outsider rule attempts to accomplish its purpose of outlawing outside campaign contributions in a single sentence, which provides:

> No candidate (including a prospective candidate) for any position set forth in Article IV, Section 1,[4] and supporter of a candidate may solicit or accept financial support, or any other direct or indirect support of any kind (except an individual's own volunteered personal time) from any nonmember.

The right to sue provision, found in the Bill of Rights for Union Members[5] section of the LMRDA, states:

> No labor organization shall limit the right of any member thereof to institute an action in any court, or in a proceeding before any administrative agency ... or the right of any member of a labor organization to appear as a witness in any judicial, administrative, or legislative proceeding, or to petition any legislature or to communicate with any legislator ....

29 U.S.C. § 411(a)(4).

We have no difficulty in ruling that the outsider rule on its face violates this right to sue provision. The language of the rule prohibiting candidates from receiving any financial support is all-encompassing and absolute. It prohibits the solicitation or acceptance of "financial support, or any other direct or indirect support of any kind" from a nonmember, except for time volunteered by an individual. This blanket prohibition, *inter alia*, would stop a candidate from using outside money to pay for a lawyer's services, from accepting the services of a lawyer for a reduced rate, or from accepting the donated services of a lawyer if the lawyer's typist, secretary or other

helper contributed to the product. One need look no further than the 1977 election for International President to see the crucial role that a lawyer's advice and other services play in an insurgent's quest for office against candidates supported by entrenched incumbents. Prior to the election Sadlowski filed several lawsuits and defended others. He also filed suits after the election. This background strongly indicates that restricting a member's right to sue was one of the Union's purposes in prohibiting outside financial support.

The Union claims that a construction of the outsider rule by the Campaign Contribution Administrative Committee (Administrative Committee) demonstrates the outsider rule does not affect the rights protected by section 101(a)(4). Shortly after plaintiffs filed this lawsuit the Union's lawyer requested the Administrative Committee to issue an advisory opinion concerning the impact of the outsider rule on the right to sue. The Committee cast the question before it as

> whether direct or indirect support by nonmembers to finance a lawsuit asserting candidates' legal rights in connection with elections *constitutes support for the purpose of influencing an election.*

Union's Brief at A–3 (emphasis added). The Committee concluded that the outsider rule did not prohibit contributions to finance litigation, stating:

> This limitation on candidacy support cannot be interpreted so broadly. An intention to limit one's access to the judicial system, a province which is so fundamental to the structure of government, cannot be inferred. It would have to be established by clear and convincing ex-

**4.** These positions are International President, International Secretary, International Treasurer, International Vice President (Administration), International Vice President (Human Affairs), one District Director for each District, and a National Director for Canada. Union Const. art. IV, § 1.

**5.** Labor's first Bill of Rights was proposed in the Hartley Bill, H.R.3020, 80th Cong. It followed the testimony of Former Governor Harold E. Stassen on the Labor Management Rela-

tions Bill, Legislative History Labor-Management Relations Bill 3844 (1947). Ten provisions were embodied in Section 8(b) of the Hartley Bill and were termed "the American working man's Bill of Rights." H.R.Rep.No. 245, 80th Cong., 1st Sess. 28 (1947). For discussion of said Bill of Rights in Congress, see 93 Cong.Rec. 3669 (1947). After the Hartley Bill reached the Senate some of the provisions were dropped but most were separated and placed elsewhere in the Act.

pressions of intent. This is not the case here.

*Id.* at A–4. We have difficulty accepting this formulation of the issue or this construction of the expansive prohibition stated in the outsider rule.[6] We need not determine whether this construction saves the rule, however, because the Administrative Committee later confused the matter in an attempt to explain the limits of the opinion and in responding to a supplemental question. The opinion continued,

> This opinion is, of course, confined to services which are in fact legal services customarily performed by lawyers. The Committee recognizes the possibility that, any ruling which it makes in general terms and in response to a broad inquiry may be misconstrued or distorted in an attempt to rationalize political activities as "legal services." It will deal with those questions whenever they arise on a case-by-case basis.

> The union, in its request for an advisory opinion, has asked the Committee to rule on two supplemental questions.

> The first is whether a different situation from that discussed above is presented "where the lawsuit is not a *bona fide* attempt to secure an adjudication of legal rights, but, rather, is motivated solely by a desire to promote a candidate's political campaign."

> We make no ruling on this variation of the central question. Such hypothesis goes beyond what can be responsibly covered by generalization. The Committee would be exceedingly reluctant about putting its own interpretation on the quality of good or bad faith that attends an individual's asserting his or her legal rights in a court proceeding. We will, however, look at such a case on its facts if it arises.

*Id.* at A–5.

The district court was greatly concerned by the question, left open by the advisory opinion, of "whether member-candidates can be disqualified or disciplined for . . .

retaining counsel [with outside financial support] and bringing suit which the Committee or the union later determines was not *bona fide.*" App. at 55. We are vexed as well, but a subsequent regulation promulgated by the International Executive Board and adopted by the Union at its 1980 convention as a part of the International Union Elections Manual causes us even greater concern. The relevant provision states:

> B. Contributions for Legal and Accounting Services

> Section 27 does not prohibit the candidate's use of financial support or services from non-members to pay fees for legal or accounting services performed in assuring compliance with applicable election laws or in securing, defending, or clarifying legal rights of candidates. Contributions of this kind are permitted only to the extent that they are confined to these permissible objects. *Activities which are designed to extract political gain from legal proceedings are subject to the support limitations of Section 27.*

Union Motion for Partial Stay at Appendix C–4 (Feb. 5, 1981) (emphasis added).

Under this construction a candidate for union office would apparently be allowed to receive volunteered or reduced-rate legal services and to accept and solicit from non-members contributions to finance "legal . . . services performed in assuring compliance with applicable election laws or in securing, defending, or clarifying legal rights of candidates." This categorization may or may not include all of the legitimate legal proceedings that a candidate for office may instigate or defend. Even if it does, the candidate cannot accept or solicit campaign contributions to be expended for "[a]ctivities which are designed to extract political gain from legal proceedings." The Union suggested at oral argument that this statement restricts a candidate only from using outsider money to finance non-litigation activities that in some way refer to litigation, such as mailing a flyer announc-

---

**6.** The district court found that the " 'advisory' opinion conflicts with the clear language of the rule and its implementing regulations." App. at 55.

ing a victory in a lawsuit or some information learned during discovery or trial. We cannot accept this limited construction.

As we read the last sentence of the regulation, "activities" includes steps in the legal proceedings themselves, so that, for instance, if the filing of a complaint, the serving of interrogatories or the taking of a deposition is "designed to extract political gain," it would be subject to the contribution limitations. This broad limitation on the right to sue subsumes whatever limit resulted from the Administrative Committee's hedging on the question whether a lawsuit "motivated solely by a desire to promote a candidate's political campaign," which is "not a *bona fide* attempt to secure an adjudication of legal rights," would be subject to the contribution restrictions. Under the regulation a candidate could not receive outside assistance to finance a lawsuit even if brought in good faith and not motivated solely by a desire to advance his campaign if it was designed to extract political gain. One would go a far distance to find *any* lawsuit brought during the heat of a campaign that was not designed to extract political gain. The regulation places a severe limitation on the right to sue. The right to sue guaranteed union members by the Bill of Rights of LMRDA is a grant of an absolute right which cannot be diminished by only permitting those suits that a union might find to be *bona fide* or not designed to extract political benefit.

The outsider rule in Section 27 on its face clearly violates the rights of union members protected by the right to sue guarantee of the LMRDA. The Union's attempts to construe the rule against its plain meaning have been unpersuasive. We now turn to what is perhaps the core issue in this case—the proper scope of the remedy for the violation of the right to sue.

## B. The Appropriate Remedy

The Union argues that if we find, as we have, that the outsider rule violates the right to sue, then "[a]t most, plaintiffs would be entitled to an injunction prohibiting application or enforcement of that provision to interfere with the solicitation or acceptance of contributions from nonmembers to finance litigation." Union's Brief at 40. The Union has suggested the form of an injunction that it believes would prevent the outsider rule from infringing on the rights protected by 101(a)(4).[7] Much of the parties' arguments on the proper scope of the remedy have focused on whether or not we can "separate" the application of the outsider rule that violates the right to sue from the remaining applications of the rule. Although we believe that the entire rule must fall, it is not because of our adherence to some formalistic nonseparability rule. Instead, we believe the remaining applications of that rule must fall because they violate the freedom of speech provision as guaranteed by section 101(a)(2) of the Bill of Rights of the LMRDA, 29 U.S.C. § 411(a)(2).

The Union contends that plaintiffs cannot now rely on section 101(a)(2) because they did not raise it in the district court. The general rule is that an appellate court does not consider issues not raised in the trial court. *E. g., Miller v. Avirom*, 384 F.2d 319 (D.C.Cir.1967). This general rule, however, is not absolute—the Supreme Court has stated that "[t]he matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." *Singleton v. Wulff*, 428 U.S. 106, 121, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976). *See Hormel v. Helvering*, 312 U.S. 552, 557, 61 S.Ct. 719, 721, 85 L.Ed. 1037

7. The suggested injunction provides:

   United Steelworkers of America, AFL–CIO–CLC, its officers, agents, representatives, attorneys and anyone acting in concert with them, are hereby enjoined from applying or enforcing Article V, Section 27 of the Constitution of United Steelworkers of America, AFL–CIO–CLC, to interfere with the solicitation, acceptance, or use by any member of any non-member contributions to finance the costs, legal fees, or other expenses of instituting, maintaining, or appearing as a witness in, an action in any court or before any administrative agency.

   Union's Brief at 44 n.20.

(1947). An example of this discretion is incorporated in the widely acknowledged rule that

> "[a]n appellate court has discretion to uphold a summary judgment under a legal theory different from that applied by the trial court, and rest the affirmance 'on any ground that finds support in the record' . . . ."

*Winter v. Local 639, International Brotherhood of Teamsters,* 569 F.2d 146, 151 (D.C. Cir.1977) (quoting *United States v. General Motors Corp.,* 518 F.2d 420, 441 (D.C.Cir. 1975)). *Accord, e. g.,* C. Wright & A. Miller, 10 Federal Practice and Procedure § 2716, at 440 (1973).

Typically when summary judgments are upheld on grounds different from those relied on by the district court, the other grounds were urged at trial. We must decide whether a different rule should apply in this case when the alternate ground was not explicitly urged before the trial court in the context that it is now presented. *Cf. Merriam v. McConnell,* 31 Ill.App.2d 241, 175 N.E.2d 293, 295 (1961) (decree of dismissal can be sustained "by any argument and upon any basis, appearing in the record, which shows that the decree is right, even if [the party in whose favo. the dismissal was granted] had not previously advanced such argument").

We believe that it is appropriate to now consider the impact of section 101(a)(2). The issue arising thereunder was argued in the briefs submitted to this court and the essential features of the contention were pleaded in connection with the two causes of action which charged violations of the free speech guarantees of the First Amendment. Our concern with now ruling on the effect of section 101(a)(2) revolves around the possibility that the Union might have

been prejudiced by plaintiffs' failure to raise the issue in the trial court in this precise context. The only way we perceive the Union could possibly be prejudiced is that it might have constructed a different record for the purposes of summary judgment if a denial of free speech under section 101(a)(2) had been alleged in plaintiffs' complaint in addition to the denial of free speech under the First Amendment. The issue of the denial of free speech under section 101(a)(2) was implicit in the question whether plaintiffs had been denied free speech under the First Amendment, as alleged in their complaint. In other words the same argument with respect to the denial of free speech under the First Amendment would have been relevant to an allegation of denial under section 101(a)(2); and the opportunity to make such an argument was open to the Union.

Since we construe section 101(a)(2) in this case to place essentially the same limits on labor unions with respect to outside campaign contributions that the First Amendment would if it applied to labor unions, we conclude the Union had ample opportunity to meet the substance of the 101(a)(2) claim.

## C. Freedom of Speech and Association

■ The free speech and assembly provision of Labor's Bill of Rights states:

> Every member of any labor organization shall have the right to meet and assemble freely with other members; and *to express any views, arguments, or opinions* . . . .

29 U.S.C. § 411(a)(2) (emphasis added).[8]

This portion of the LMRDA is patterned after the essential features of the First Amendment, *Ostrowski v. Utility Workers Local 1–2,* 104 L.R.R.M. 2343, 2350 (S.D.N.

---

**8.** 29 U.S.C. § 411(a)(2) in its entirety provides:

Freedom of speech and assembly.—Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organiza-

tion's established and reasonable rules pertaining to the conduct of meetings: *Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

Y.1980), which provides: "Congress shall make no law ... abridging the freedom of speech ... or the right of people peaceably to assemble ...." U.S.Const. amend. I.[9] The LMRDA guarantee of freedom of expression is not confined to the exercise of that right among union members. *Ostrowski v. Utility Workers Local 1–2,* 104 L.R. R.M. 2343, 2350 (S.D.N.Y.1980); *Graham v. Soloner,* 220 F.Supp. 711, 714 (E.D.Pa.1963). The provision recognizes the right of union members

> to assemble in groups, if they like, and to *visit their neighbors* and to discuss union affairs, and to say what they think, or perhaps discuss what should be done to straighten out union affairs, or perhaps *discuss the promotion of a union movement,* or *perhaps a policy in which they believe ....*

105 Cong.Rec. 6477 (1959) (remarks of Sen. McClellan) (emphasis added), *quoted in Ostrowski v. Utility Workers Local 1–2,* 104 L.R.R.M. 2343, 2350 (S.D.N.Y.1980). The right of *free association* is an inseparable aspect of freedom of speech. *NAACP v. Alabama, ex rel., Patterson,* 357 U.S. 449, 460, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958); *Ostrowski v. Utility Workers Local 1–2,* 104 L.R.R.M. at 2351. As the Supreme Court stated in *Griswold v. Connecticut,* 381 U.S. 479, 483, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965):

> The right of "association" ... is more than the right to attend a meeting; it includes the right to express one's attitudes or philosophies by membership in a group or by affiliation with it or by other lawful means. *Association in that context is a form of expression of opinion* ; and while it is not expressly included in the First Amendment its existence is necessary in making the express guarantees fully meaningful. [Emphasis added].

Our analysis of section 101(a)(2) is guided by a recommendation made by Professor Cox shortly after the passage of the LMRDA:

The legislation contains more than its share of problems for judicial interpretation because much of the bill was written on the floor of the Senate or House of Representatives and because many sections contain calculated ambiguities or political compromises essential to secure a majority. Consequently, in resolving them the courts would be well advised to seek out the underlying rationale without placing great emphasis upon close construction of the words.

Cox, *Internal Affairs of Labor Unions under the Labor Reform Act of 1959,* 58 Mich. L.Rev. 819, 852 (1960), *quoted in Wirtz v. Local 153, Glass Bottle Blowers Association,* 389 U.S. 463, 468 n.6, 88 S.Ct. 643, 646 n.6, 19 L.Ed.2d 705 (1968); and *Usery v. Local 639, International Brotherhood of Teamsters,* 543 F.2d 369, 387 n.50 (D.C.Cir.1976), cert. denied, 429 U.S. 1123, 97 S.Ct. 1159, 51 L.Ed.2d 573 (1977).

One of the principal purposes of the Act was "to insure union democracy."[10] The interim report of the Select Committee on Improper Activities in the Labor or Management Field, which preceded the LMRDA, in its legislative recommendations stated:

> While the committee feels that the bulk of American unions operate *fairly and democratically* and agrees with the principle that the Federal Government should not interfere in their normal functioning, it is still of the opinion that certain basic standards of democratic procedure should be established by law.

Interim Report of the Select Committee on Improper Activities in the Labor or Management Field, S.Rep.No.1417, 85th Cong., 2d Sess. 452 (1958) (emphasis added) (hereinafter Select Committee Report).

Even without contribution limitations, challengers to the union leadership face substantial barriers, especially the electoral power of the union staff. Union democracy

---

**9.** The other great right protected by the First Amendment, the right to petition for a redress of grievances, is also guaranteed to union members by 29 U.S.C. § 411(a)(4).

**10.** S.Rep.No.187, 86th Cong., 1st Sess. 2 (1959); H.R.Rep.No.741, 86th Cong., 1st Sess. 2 (1959).

can only occur if effective challenges can be made to the often-entrenched union leadership. Any attempt that would operate to inhibit insurgents must be carefully scrutinized. *See Retail Clerks Local 648 v. Retail Clerks International Association,* 299 F.Supp. 1012, 1020 (D.D.C.1969) ("Where a union policy and practice is promulgated in order, among other things, to place obstacles in the way of effective union democracy and appears to have this effect, ... the Court cannot give that policy any recognition as it offends both equity and the provisions of the LMRDA.")

. In our view the outsider rule's blanket prohibition on outside contributions for "traditional campaign purposes," Union's Brief at 41, violates the rights of the candidate and his supporters to free speech and association as guaranteed by section 101(a)(2) and flies squarely in the face of the intent of the LMRDA to "insure union democracy." We find support for this conclusion in the analogous context of contribution limitations in federal elections.

In *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the Supreme Court ruled on the constitutionality of, *inter alia,* the expenditure and contribution limitations of the Federal Election Campaign Act of 1971, 86 Stat. 3, as amended. The Court recognized the significant connection between money and political speech:

> A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached.

424 U.S. at 19, 96 S.Ct. at 634. With respect to contributions the court stated:

> Given the important role of contributions in financing political campaigns,

contribution restrictions could have a severe impact on political dialogue if the limitations prevented candidates and political committees from amassing the resources necessary for effective advocacy.

*Id.* at 21, 96 S.Ct. at 635. Finding "no indication ... that the contribution limitations imposed by the Act would have any dramatic adverse effect on the funding of campaigns and political associations," *id.,* the Court upheld a limitation of $1,000 on the amount an individual could contribute to a particular candidate in an election. .

In our view, the freedom of speech guarantee in the LMRDA serves to limit labor unions much as the First Amendment limits Congress in the restrictions that can validly be placed on campaign finance, but the Bill of Rights guarantees of the LMRDA are not limited to situations involving "state action." Accepting *Buckley* as persuasive authority and finding meaningful direction from the legislative history of the LMRDA, we conclude that the outsider rule in many instances could unquestionably operate to prevent candidates, at least those facing the electoral power of entrenched union staffs, from "amassing the resources necessary for effective advocacy."

The rule permits no outside campaign contributions whatsoever. A candidate for union office cannot receive or solicit contributions from friends, relatives, Union members not in good standing, retired Union members, or well-wishers. The Union restrictions would not permit a candidate to . receive a loan from his nonmember father, or a close friend, even if the loan were fully secured and carried a reasonable rate of interest. The implementing regulations contain expansive definitions of "financial support" [11] and "indirect support." [12] They also state:

---

**11.** "Financial Support" means a direct or indirect contribution where the purpose, object or foreseeable effect of the support is to influence the election of a candidate. Financial support includes, but is not limited to:

    1. Contributions of money, securities, or any material thing of value;

    2. Payments to or subscription for fund raising events of any kind (e. g., raffles, dinners, beer or cocktail parties and so forth);

    3. Discounts in the price or cost of goods or services, except to the extent that commercially established discounts are generally available to the customers of the supplier;

[W]hen prohibited support is contributed, there will be a presumption that it was accepted by the candidate or his or her supporters, unless they have taken affirmative steps in good faith to dissuade the nonmember from providing such support and have taken action to correct the effects of the prohibited support.[13]

The candidate who solicits outside support or who is unable to rebut the presumption that he has accepted support that has been contributed faces serious penalties. The Administrative Committee may "declare such candidate *disqualified*." Union Const. art. V, § 27(d) (emphasis added). In addition the Union Constitution contains a general "Discipline" provision (Article XII), which makes a violation of any provisions of the Constitution punishable by *fine, suspension,* or *expulsion.*

Even if we assume that the Union's only purpose in passing the outsider rule was to keep undesirable outside influence out of internal union affairs, we could not accept the broad limitations placed on a candidate's ability to receive outside campaign contributions that are *not* prohibited by the statute.[14] The Union no doubt has a legitimate interest in protecting its internal affairs from nefarious influences. But that interest cannot justify a rule that prohibits a candidate, particularly an insurgent candidate, for union office from receiving *any* contributions or loans (except from institutional lenders) from nonmembers.

The Union suggests that Section 27 might be held valid under the proviso in 101(a)(2) which authorizes "reasonable" rules to protect unions as institutions. One of the prime purposes of Congress in enacting the Labor-Management Reporting and Disclosure Act was to "insure union democracy."[15] The issue is thus framed as to whether an absolute prohibition on outside contributions is a "reasonable" protection of a union as an institution or a feature that would operate to deny "union democracy." We cannot conceive of anything that would do more to inhibit union democracy than to prohibit insurgent candidates from receiving financial support from those outside sources that are not prohibited by the statute. Such a rule in our opinion is unreasonable. Friends, relatives, spouses, Steelworkers who are not in good standing in the Union, and well wishers in the public could not make any contribution, or even a well-secured loan at reasonable interest rates to support any such candidate.

We therefore conclude that the complete prohibition on outside financial support as declared in Section 27 is not on its face a "reasonable" rule governing the union

---

4. Extensions of credit, loans, and other similar forms of finance, except when obtained in the regular course of business of a commercial lending institution and on such terms and conditions as are regularly required by such institutions; and

5. The payment for the personal services of another person, or for the use of building or office space, equipment or supplies, or advertisements through the media.
Union Motion for Partial Stay at Appendix C–2 (Feb. 5, 1981).

12. Indirect Support

Section 27 prohibits the solicitation and acceptance of indirect as well as direct campaign contributions from non-members. Examples of indirect support from non-members would include, the contribution of cash to a member who in turn makes a contribution to a candidate; the donation of travel expenses, printing services, office supplies, office space, or of clerical, secretarial, or professional services used by a non-member in conjunction with his or her own volunteered service to a candidate; the distribution of election materials with the aid of a volunteer's paid staff; and the procuring of discounts.
Union Motion for Partial Stay at Appendix C–3 (Feb. 5, 1981).

13. The regulation continues:

In such cases where prohibited support has been contributed, it is the candidate's obligation to contact immediately the non-member contributor, reject the prohibited support, return the contribution, insist that such support be discontinued, and take whatever action on his or her own, or as directed by the Committee, may be necessary to eliminate any impact on the election. Full reports must be made to the Committee promptly.
Union Motion for Partial Stay at Appendix C–3, 4 (Feb. 5, 1981).

14. *See* note 17 and accompanying text, *infra.*

15. *See* note 10 and accompanying text, *supra.*

member's responsibility to the union. There is thus no reason to deviate from the general rule against upholding a statute in part where the remainder trespasses on free speech rights. *Thornhill v. Alabama,* 310 U.S. 88, 97–98, 60 S.Ct. 736, 741–742, 84 L.Ed. 1093 (1940).[16]

Our view that the free speech guarantee of the Bill of Rights in the LMRDA prohibits a complete prohibition on outside financial contributions to Union candidates gains support from the intent implicit in section 401(g) of the LMRDA, 29 U.S.C. § 481(g), and the legislative history of that provision. Congress dealt in a comprehensive manner with the subject of financial support, including outside support, of candidates in Union elections in 29 U.S.C. § 481(g).[17] Following such consideration Congress limited its restrictions on financial support to prohibiting any candidate from using moneys collected as union "dues, assessment, or similar [levies]" and to providing that "no moneys of an employer shall be contributed or applied to promote" any candidate.

Prior to the enactment of the LMRDA in 1959 the Select Senate Committee ferreted out widespread corruption, dictatorship and racketeering in a number of large international unions. The Committee found that the President of the Bakery and Confectionary Workers' International Union of America had "railroaded through changes in the union constitution which destroyed any vestigial pretenses of union democracy." Select Committee Report, *supra,* at 129. It reported that Dave Beck, General President of the International Brotherhood of Teamsters "shamefully enriched himself at [the] expense [of the union members] and

that in the final instance he capitulated to the forces within the union who promoted the interests of racketeers and hoodlums." *Id.* at 84. The Committee likewise found Teamster officials joining with others to take over illegal gambling operations with an "underworld combine," *id.* at 38–39, and the top officers of the United Textile Workers of America avariciously misappropriating union funds, *id.* at 159. "Democracy [was] virtually nonexistent" in the International Union of Operating Engineers because the union was ruthlessly dominated through "violence, intimidation and other dictatorial practices." *Id.* at 437. Practices in the Teamsters "advanced the cause of union dictatorship." *Id.* at 444. The Committee cited other similar instances of widespread abuses in its 462-page Report.[18]

With such highly objectionable conditions disclosed in the hearings of the Select Committee preceding enactment of the Labor-Management Reporting and Disclosure Act of 1959, it is likely that when Congress outlawed only union and employer campaign contributions, it intended to permit candidates for union office to obtain other outside financial support from legitimate sources. Obtaining some outside support would be a practical necessity in many cases if members were to have any realistic opportunity to oust such corrupt and dictatorial incumbents as the Select Committee found in some of the unions it examined.

Walter Reuther and James Hoffa have recognized that the *public* has a right to be concerned about unions. Reuther said:

[I]n our rapidly changing and more closely interrelated and interdependent eco-

---

**16.** It has also been suggested that Section 27 constitutes an unreasonable qualification on union candidacy in violation of 29 U.S.C. § 481(e). 55 Chi.-Kent L.Rev. 769, 790–91 (1979).

**17.** 29 U.S.C. § 481(g) provides:
No moneys received by any labor organization by way of dues, assessment, or similar levy, and no moneys of an employer shall be contributed or applied to promote the candidacy of any person in an election subject to the provisions of this subchapter [29 U.S.C. §§ 481–483]. Such moneys of a labor organization may be utilized for notices, factual

statements of issues not involving candidates, and other expenses necessary for the holding of an election.

**18.** Current newspaper stories report the possibility that some of the same conditions still continue. A March 12, 1981 United Press International news story reports "Mob Said to Control 4 National Unions." The news story relied upon a confidential Justice Department Report and referred to the Teamsters, Laborers, Longshoremen and the Hotel, Restaurant and Bartenders International Unions.

nomic and political society, labor cannot be an island unto itself.

Reuther, *Labor Leadership—A Public Service*, in E. Bakke, C. Kerr & C. Anrod, Unions, Management and the Public 128 (2d ed. 1960).

And Hoffa testified before the Select Committee:

> I recognize my responsibility to the general public. I think my record speaks for itself * * *. I believe that the more power there is concentrated into a labor organization, the more responsible and careful the unions must be not to lose the complete power of having the right to have a union.

Select Committee Report, *supra*, at 249.

While it might be argued from the above Legislative history that Congress may not have intended to completely preempt the field by its provision prohibiting only the use of union and employer money, it is highly unreasonable to expect that Congress intended to leave the door open for as

absolute a prohibition as is embodied in Section 27. Such construction would leave union members practically at the mercy of every entrenched group of incumbents.[19]

## III. CONCLUSION

Having found that the critical sentence in Section 27 not only violates 101(a)(4), but also in prohibiting outside contributions for traditional campaign purposes unreasonably impinges on the right of free speech and association guaranteed by section 101(a)(2), we must find that the outsider rule as set forth in the first sentence of Section 27 is invalid in its entirety.[20]

█ The question remains whether any of the other provisions of Section 27 can survive. We conclude that they cannot with one exception. The remaining provisions of Section 27, except one, all provide in some manner for the enforcement of the prohibitions on candidates receiving any outside financial support[21] as prohibited by

---

**19.** The Union also contends that the recent decision of the Supreme Court in *Democratic Party v. LaFollette*, —— U.S. ——, 101 S.Ct. 1010, 67 L.Ed.2d 82 (1981), supports the validity of Section 27. We disagree. That decision upheld a rule of the Democratic Party that only voters who publicly recorded their preference for the Democratic Party could vote in the selection process for delegates to the national convention, against a Wisconsin law that permitted *any* voter to vote in a state election which purported to bind delegates to the Democratic National Convention in their votes on presidential candidates. The decision in *Democratic Party* is inapposite here. It frees elected delegates from being required at the National Convention to vote the preference for president expressed in an election which was *not* limited to publicly recorded Democrats, but in no way restricts any candidate for delegate from receiving financial support from independents and even from members of other parties.

**20.** Our authority to invalidate part of the Union Constitution comes from section 101(b) of the LMRDA, 29 U.S.C. § 411(b), which provides:

> Any provision of the constitution and by-laws of any labor organization which is inconsistent with the provisions of this section shall be of no force or effect.

We also note that plaintiffs were not required to exhaust an available administrative remedy. The Union has not raised that point, and as explained by the court in *Ostrowski v. Utility*

*Workers, Local 1–2*, 104 L.R.R.M. 2343, 2345–46 (S.D.N.Y.1980):

> Section 411(a)(4) [of Title 29 U.S.C.] provides that a union member "may be required to exhaust reasonable hearing procedures (but not to exceed a four-month lapse of time) with [his union], before instituting legal or administrative proceedings." The limitations of Section 411(a)(4) are permissive; thus, *whether or not a plaintiff will be required to* utilize his internal union appeals is a matter within the discretion of the trial judge. [citing cases].
>
> It is well-established that "a free speech violation generally justifies dispensing with administrative remedies." *Keeffe Bros. v. Teamsters Local Union No. 592*, [562 F.2d 298, 303 (4th Cir. 1977)].

In addition, "beneficial and fair requirements of administrative exhaustion should not be imposed absent realistic possibility of a meaningful remedy." *Alexander v. Yale University*, 459 F.Supp. 1, 6 (D.Conn.1977). It is evident from these rules that plaintiffs were under no obligation to exhaust any remedy within the Union.

**21.** The remaining provisions of Article V, Section 27 may be summarized as follows:

(1) The International Executive Board was empowered to adopt regulations for the Union's Election Manual to implement the prohibitory provision of the first sentence and require reporting not more frequently than weekly by candidates and their supporters, to insure compliance with said Section.

the first sentence of Section 27, and since we find such sentence to be invalid there is nothing left to enforce. We thus rule that the Administrative Committee shall not retain any of the power or authority derived from Section 27, with the one noted exception. Section 27(f) provides: "if the International Executive Board deems it advisable" said Board may determine that the Committee "may have such other powers as the . . . Board determines are necessary for the implementation of . . . any *other* Section [Section 27 excluded] of Article V." Union Const. art. V, § 27(f) (emphasis added). Since this case does not involve any *other* section of the Constitution, if the International Board considers it necessary to exercise this authority in connection with some *other* section of the Constitution, this opinion does not prohibit such action. However, such *other* powers could not be used in any way to implement any of the prohibitions attempted by Section 27.

We agree with the district court in its judgment that the outsider rule violates the right to sue provision of the LMRDA. Our belief that the rule seriously impinges on the rights of free speech and association protected by section 101(a)(2) of the LMRDA leads us to agree with the district court that the *entire* rule must fall.[22] We therefore affirm the judgment of the district court enjoining the Union from implementing or enforcing Article V, Section 27 of the United Steelworkers of America Constitution in its entirety, with the aforesaid exception, and requiring the Union to publish notice in *Steel Labor.*

(2) A Campaign Contribution Administrative Committee composed of three persons who are not members of the Union was created to administer and enforce Section 27. Such Committee was authorized (a) to promote compliance with the "prohibited support provision" of Section 27; (b) to issue cease and desist orders directing any candidate or supporter to cure any violation of Section 27; (c) to require candidates and supporters to report such information as the Committee "deems appropriate" and to review such information; (d) to declare a "candidate disqualified" for a violation of Section 27 by the "candidate, or a supporter of a candidate"; (e) to institute "legal proceedings" that it determines "in its sole discretion . . . are necessary for the enforcement of Sec-

We also affirm the dismissal of the Secretary of Labor from the case for lack of jurisdiction.

Because of the nearness of the upcoming election the clerk of court is hereby ordered to issue the mandate forthwith.

*Judgment accordingly.*

## APPENDIX

Article V, Section 27 of the Constitution of the United Steelworkers of America, adopted September 21, 1978, provides:

Sec. 27. No candidate (including a prospective candidate) for any position set forth in Article IV, Section 1, and supporter of a candidate may solicit or accept financial support, or any other direct or indirect support of any kind (except an individual's own volunteered personal time) from any non-member. For purposes of this Section, the term nonmember means any person who is either not eligible for membership under Article III or not in good standing or any foundation, corporation or other entity whose funds are derived in whole or in part from any person not eligible for membership under Article III or not in good standing.

The International Executive Board shall adopt regulations, for incorporation into the International Union Elections Manual, as necessary to implement this provision and to assure conformity with the obligations prescribed in this Section.

tion 27"; (f) to recommend amendments to the regulations to the International Board and to have "such other powers as the International Executive Board determines are necessary for the implementation of . . . Section 27"; and (g) to make decisions with respect to the administration of Section 27 that "shall be final and binding, and not subject to review by any tribunal within the Union."

See the Appendix to this opinion for the complete text of Section 27.

22. It is thus unnecessary to decide whether there was sufficient "state action" to raise First Amendment questions. The section 101(a)(2) guarantee of free speech does not require "state action."

Such regulations shall include requirements for reporting by candidates and their supporters of information pertinent to administration of and compliance with this Section, with such frequency, not to exceed weekly, as the International Executive Board deems appropriate.

There is hereby created a Campaign Contribution Administrative Committee to administer and enforce this Section. This Committee shall consist of three persons, appointed by the International Executive Board, for a term to begin not later than May 1, 1979, and end on August 1, 1983, who shall be distinguished, impartial citizens who are not members of the International Union. If a Committee member dies or resigns, the International Executive Board shall appoint a replacement. A quorum shall consist of two members of the Committee. The International President shall fix the compensation and expenses of the Committee members, and shall arrange for the provision of supplies, services, and all other assistance required by the Committee. The Committee shall have the following powers:

(a) The Committee shall have the authority to contact any and all non-members who it feels may be providing, or attempting to provide, prohibited support to any candidate, and attempt by persuasion to convince such non-members to refrain from providing such support.

(b) The Committee shall have the power (i) to direct any candidate, or any supporter, to cease and desist from any course of conduct which the Committee believes breaches this Section or the regulations of the International Executive Board adopted pursuant to this Section, and (ii) to direct any candidate, supporter or non-member to take such corrective action as the Committee deems appropriate to cure the effects of any violation and/or assure that any improper conduct will not have an effect upon the election.

(c) The Committee shall receive and promptly review the information candidates and their supporters are required to file by the regulations of the International Executive Board and by such additional requirements as the Committee may establish. The Committee may require candidates and their supporters to report whatever additional information the Committee deems appropriate to perform its functions.

(d) In the event that a candidate, or a supporter of a candidate with that candidate's knowledge or acquiescence, willfully and substantially breaches the obligations prescribed in this Section, or the regulations adopted by the International Executive Board pursuant to this Section, the Committee shall, upon notice and hearing under such expedited conditions as the Committee deems appropriate in the circumstances, have the power to declare such candidate disqualified, and to so notify the International Tellers.

(e) If the Committee in its sole discretion determines that legal proceedings are necessary for the enforcement of this Section 27, it may institute whatever legal proceedings it deems appropriate, in the name of the International Union. The Committee shall be the only party authorized to institute legal proceedings to enforce the provisions of this Section 27.

(f) The Committee may recommend to the International Executive Board that additions or amendments be made to the regulations adopted by the International Executive Board pursuant to this Section and shall have such other powers as the International Executive Board determines are necessary for the implementation of this Section or, if the International Executive Board deems it advisable, any other Section of Article V.

Any member who believes that another member is violating these provisions may file a complaint with the Committee. The Committee shall process that complaint in such manner as it deems appropriate, and may adopt rules with respect to the filing and processing of member complaints.

With respect to the administration of this Section 27, decisions of the Commit-

tee shall be final and binding, and not subject to review by any tribunal within the Union.

At the 1980 Biennial Convention of the Union the four lines immediately above were stricken and the following new matter was inserted in lieu thereof.

With respect to any pre-election matters within its jurisdiction, decisions of the Committee shall be final and binding, and not subject to review by any tribunal within the Union.

The Campaign Contribution Administrative Committee shall have exclusive jurisdiction of all post-election contests to all or part of the election based upon the following grounds:

(1) Alleged violations of this Section 27;

(2) Alleged violations of any rules or regulations adopted pursuant to this Section 27; or

(3) Alleged violations of the prohibition (contained in the International Union Elections Manual adopted pursuant to Article V, Section 4) against the use of union or employer funds or facilities for campaign purposes.

A candidate who wishes to file a contest on any of the above grounds must, in order to perfect such contest, file the contest with the Campaign Contribution Administrative Committee within such time period and pursuant to such rules as the Committee shall establish. The Committee shall investigate such contests, make determinations on those contests and make a report of its determinations and recommendations to the International Executive Board in time to be considered by the International Executive Board prior to September 1 of the election year.