**UNITED STATES of America,**
**Plaintiff-Appellant,**

v.

**2,606.84 ACRES OF LAND IN TARRANT COUNTY, TEXAS, and Frank Corn, et al., Defendants-Appellees.**

**No. 28390.**

United States Court of Appeals,
Fifth Circuit.

Oct. 16, 1970.

Rehearing Denied Nov. 9, 1970.

Shiro Kashiwa, Asst. Atty. Gen., Eldon B. Mahon, U. S. Atty., Fort Worth, Tex., Claude D. Brown, Asst. U. S. Atty., Fort Worth, Tex., Roger P. Marquis, Robert McKee, George R. Hyde, Attys., Department of Justice, Washington, D. C., for the appellant.

Cantey, Hanger, Gooch, Cravens & Munn, R. Daniel Settle, Carlisle Cravens, Fort Worth, Tex., for appellees; Cantey, Hanger, Gooch, Cravens & Munn, Fort Worth, Tex., of counsel.

Before GEWIN, GOLDBERG and SIMPSON, Circuit Judges.

GOLDBERG, Circuit Judge:

In this condemnation proceeding the government appeals from a final judgment setting aside a declaration of taking[1] for the Benbrook Dam and Reservoir in Tarrant County, Texas. The judicial asides and interregnum of the Benbrook project cover a span of many years, and mere time has not laid its problems to rest. Now, more than twenty years after the land was taken by the United States and years after water began to flow over its spillway, we must test its birth and development for legitimacy.

The saga of Benbrook Dam began in 1944 when Congress was presented a report, later denominated House Document 403, containing plans and specifications for a proposed dam and reservoir to be built on the Clear Fork of the Trinity River near Forth Worth, Texas. Congress subsequently authorized the construction of the Benbrook project in

---

1. Title 40 U.S.C.A. § 258a provides that in any condemnation case title to condemned land immediately vests in the United States after the authority empowered to acquire the lands files a declaration of taking and deposits the estimated compensation due.

Public Law 14, Act of March 2, 1945, Pub.L.No.79–14, § 2, 59 Stat. 10, which provided that

"The improvement of the Trinity River and tributaries, Texas, for navigation, flood control, and allied purposes is hereby approved and authorized in accordance with the reports contained in House Document numbered 403, Seventy-seventh Congress;"

Pursuant to this authorization, the United States in 1950 instituted condemnation proceedings to secure the land needed for the Benbrook project. Included in the land sought by the government were 1,207 acres from tract B–108 owned by Sid W. Richardson. The Secretary of the Army filed a declaration of taking stating that

"The public uses for which said land is taken are as follows: The said land is taken to provide for the construction and operation of Benbrook Dam and Reservoir on the Clear Fork of the Trinity River in Trinity River Basin, Texas."

Richardson, the landowner, filed an answer objecting to the taking of his property on the grounds that the taking transgressed legislative purposes and that the proposed construction departed from authorized project specifications. Specifically, Richardson alleged first that the fee interest in his land above a certain level was not sought for the purposes sanctioned by Public Law 14 and espoused by the Secretary of the Army— the construction and operation of Benbrook Dam—but was earmarked for recreational use, a purpose not authorized by Congress. Second, Richardson argued that the dam and reservoir being constructed were a substantial departure from and at variance with the public work described in H.D. 403 and authorized by Public Law 14, and that the Secretary's attempt to take the land was arbitrary and capricious because unauthorized by law.

After a fifteen-year delay [2] and the death of the landowner, proceedings on this claim were finally held before the district court sitting without a jury. The court made copious findings of fact and concluded that the land lying above 697.1 foot elevation (647 acres) was taken for a recreational purpose and that condemnation for such a purpose was not authorized by Public Law 14. The trial court further concluded that the entire taking was without authority because the dam and reservoir as actually built were materially changed from the project authorized by Congress. The court determined, however, that the landowner had validly waived his right to contest the taking of the area below elevation 697.1. Accordingly, the court vested title to the 560 acres below elevation 697.1 in the United States. Title to the 647 acres above elevation 697.1 was vested in the Estate of Sid W. Richardson. The United States appealed from this determination. Disagreeing with the conclusion of the trial court, we are compelled to reverse.

I.

The landowner's first contention is that the government, through the Secretary of the Army, attempted to condemn land for recreation, a purpose not authorized by Congress. The trial court agreed, finding that the land above elevation 697.1 was taken solely for recreation and that recreation was a purpose not authorized by Congress in Public Law 14. The trial court apparently reached this conclusion because it found evidence in the record that the Corps of Engineers had some recreational facilities planned for the area and further found that Richardson's land was not necessary for either the construction or operation of the Benbrook Dam and Reservoir. In other words, the trial court found that the Secretary's stated purpose for the taking—the construction and operation

2. The delay was occasioned by the refusal of the Secretary of the Army to submit to certain discovery procedures ordered by the district court. See United States v.

Richardson, 5 Cir. 1953, 204 F.2d 552, where this court refused to review the order of the district court.

of the project—was not the real purpose for which the land was condemned. The court reached this conclusion by finding that the land was not necessary to achieve that stated purpose. We think that in so finding the court overstepped the bounds of judicial review in condemnation cases.

■ The argument that land sought to be condemned is not really necessary for the consummation of a plan is frequently made in condemnation cases in an attempt to defeat the taking. This argument, however, has been unanimously rejected by every court which has considered the matter. It is perfectly clear that the judicial role in examining condemnation cases does not extend to determining whether the land sought is actually necessary for the operation of the project. As the Supreme Court explained in Berman v. Parker, 1954, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27

"* * * The argument pressed on us is, indeed, a plea to substitute the landowner's standard of the public need for the standard prescribed by Congress. But as we have already stated, community redevelopment programs need not, by force of the Constitution, be on a piecemeal basis—lot by lot, building by building.

"It is not for the courts to oversee the choice of the boundary line nor to sit in review on the size of a particular project area. Once the question of the public purpose has been decided, the amount and character of land to be taken for the project and the need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch. See Shoemaker v. United States, 147 U.S. 282, 298, 13 S.Ct. 361, 390, 37 L.Ed. 170, 184; United States ex rel. Tennessee Valley Authority v. Welch, supra, 327 U.S. [546] at page 554, 66 S.Ct. [715] at page 718 [90 L.Ed. 843); United States v. Carmack, 329 U.S. 230, 247, 67 S.Ct. 252, 260, 91 L.Ed. 209, [220.]" 348 U.S. at 35, 36, 75 S.Ct. at 104.

This court later made the same observations in West, Inc. v. United States, 5 Cir. 1967, 374 F.2d 218, wherein we said:

"Appellants here contend that the taking of a fee interest by the United States was without authority when a flowage easement would have sufficed for the purpose intended. This argument is without merit. Provided that land can be reasonably related to a public purpose, the United States, in eminent domain proceedings, is not limited to taking in fee the amount of property which will be physically occupied by the public or actually submerged in a flood control operation. If Congress wanted to dot every *i* and cross every *t* in the pursuit of a legislative command, it would have the power and right to do so; but the courts should only sparingly deny governments an operable orbit to accomplish a legislative end. Numerous cases sustain the proposition that the purpose intended being valid, the necessity of the taking and the character of the title to be taken are decisions vested exclusively in the Secretary. E. g., Berman, supra; Welch, supra; Shoemaker, supra; United States v. Agee, 322 F.2d 139 (6 Cir. 1963). See also In re United States, 257 F.2d 844 (5 Cir. 1958).

"The Supreme Court in Berman, supra, 348 U.S. at 36, 75 S.Ct. at 104, 99 L.Ed. at 39, discussing the Agency's right to take full title to property pursuant to a redevelopment project concluded that if the Secretary considers it necessary in carrying out the project to take fee title to property involved, it may do so. The Court stressed its opinion that it is not for the judiciary to determine what is necessary for successful consummation of a project any more than it is the court's function to select the precise parcels to be condemned. Compare United States v. 6.74 Acres of Land, etc., 148 F.2d 618 (5 Cir. 1945), holding that the lower court was without right to question the Secretary's ac-

tion either as to the necessity of taking or as to the extent of the interest in the property taken where, while under lease and in possession of property, the United States condemned fee title thereto." 374 F.2d at 222.

*Accord,* Shoemaker v. United States, 1893, 147 U.S. 282, 13 S.Ct. 361, 37 L.Ed. 170; O'Brien v. United States, 5 Cir. 1968, 392 F.2d 949; Wilson v. United States, 10 Cir. 1965, 350 F.2d 901; 2,-953.5 Acres of Land, etc. v. United States, 5 Cir. 1965, 350 F.2d 356; United States v. 91.69 Acres of Land, 4 Cir. 1964, 334 F.2d 229.

■ The district court attempted to take the present case out of this rule of non-justiciability by characterizing the question as one of purpose rather than necessity. Instead of finding outright that the land was not needed for the stated purpose, the court concluded that the purpose stated by the Secretary of the Army in the declaration of taking was not the real purpose for the taking and that the real purpoes, recreation, was unauthorized. We do not think this slight change in terminology is sufficient to convert what is essentially a legislative determination into a judicial question. United States v. Mischke, 8 Cir. 1961, 285 F.2d 628. In fact, the change in terminology does not disturb the court's basic finding of non-necessity. In order to find that the stated purpose was not the real purpose the court was forced to find that the land was not necessary to achieve that stated purpose. It is clear that this is an inquiry forbidden to the court. Berman v. Parker, *supra*; West, Inc. v. United States, *supra*.

■■ The Supreme Court in Catlin v. United States, 1945, 324 U.S. 229, 65 S.Ct. 631, 89 L.Ed. 911, did indicate that a landowner has a right to question the validity of a taking as not being for a *purpose* authorized by the statute under which the proceeding is brought. However in view of that Court's later characterization of the judicial function in condemnation cases, Berman v. Parker, *supra*, we can only conclude that the term "purpose" as used by the Court in *Catlin* had a much broader meaning than the landowner here would allow. In *Catlin* the Court must have used the term "purpose" in the sense of the overall project rather than in the sense of some minor part of the project. In other words, we think that if Congress had never authorized a dam on the Clear Fork of the Trinity River, then the landowner might here claim under the *Catlin* rule that his land was being taken for an unauthorized purpose. However, once Congress approved the Benbrook Dam, the taking for any purpose associated with that project was an authorized purpose, and the landowner cannot be heard to complain that the condemnation was not necessary to the dam's construction or operation.

The only exception to this rule would occur if the delegated official so overstepped his authority that no reasonable man could conclude that the land sought to be condemned had some association with the authorized project. In such a case alone could the taking be considered arbitrary or capricious as those terms are used in condemnation proceedings. There must be basic to the project pervasive deception, unreasoned decision, or will-of-the-wisp determination before these words of pejoration are brought into play.

■ In the present case there is no evidence from which the court could conclude that the land above elevation 697.1 was so disassociated with the Benbrook Dam as to render the taking arbitrary or capricious in this necessary sense. See United States v. Carmack, 1946, 329 U.S. 230, 67 S.Ct. 252, 91 L. Ed. 209. Aside from the fact that the questioned land was in close proximity to the reservoir and the dam, there was also evidence that if the land were left in the hands of private ownership a safety hazard would be created. In such circumstances the judiciary may not substitute its judgment for that of the Corps of Engineers. There is an administrative assertion by the Secretary of the Army that the land is necessary to the

construction and operation of the project. That assertion is not so patently untenable that a reasonable person could not find an association between the project and the land. Once this determination is made the judicial function is ended and the declaration of taking must be sustained.

Judges are expected to be wise in their judicial dispensations and learned in the law, but it must be conceded that they are not hydrographers, reclamation engineers, meteorologists, or informed in the art of geodetics. Congress has wisely committed to the expert their spheres of expertise, in this instance the Corps of Engineers under the supervision of the Secretary of the Army. The court should not and may not interfere with the exercise of the discretion given to these experts. We therefore conclude that it was beyond the judicial power of the district court to inquire into the necessity for taking the area above elevation 697.1. Consequently, the court could not use its finding of non-necessity to support its ultimate conclusion that the taking was solely for recreational purposes and therefore unauthorized.

■ Moreover, even if the court had been empowered to inquire into the necessity of the taking for the construction and operation of the dam and to deduce a recreational purpose from its finding of non-necessity, we find such conclusion legally irrelevant. Public Law 14 authorizing the construction of Benbrook Dam and Reservoir approved the project for "navigation, flood control and allied purposes." As the Supreme Court has recently noted, it has been government policy since 1944 to build recreational areas in conjunction with federal reservoir projects. United States v. Reynolds, 1970, 397 U.S. 14, n. 1, 90 S.Ct. 803, 25 L.Ed.2d 12. In Public Law 534, Act of December 22, 1944, Pub.L.No.78–534, § 4, 58 Stat. 889, Congress provided:

"The Chief of Engineers, under the supervision of the Secretary of War, is authorized *to construct, maintain, and operate public park and recreational facilities in reservoir areas un-der the control of the War Department, and to permit the construction, maintenance and operation of such facilities.* The Secretary of War is authorized to grant leases of lands, including structure or facilities thereon, in reservoir areas for such periods and upon such terms as he may deem reasonable: *Provided,* That preference shall be given to Federal, State, or local governmental agencies, and licenses may be granted without monetary consideration, to such agencies for the use of areas suitable for public park and recreational purposes, when the Secretary of War determines such action to be in the public interest. The water areas of all such reservoirs shall be open to public use generally, without charge, for boating, swimming, bathing, fishing, and other recreational purposes, and ready access to and exit from such water areas along the shores of such reservoirs shall be maintained for general public use, when such use is determined by the Secretary of War not to be contrary to the public interest, all under such rules and regulations as the Secretary of War may deem necessary. No use of any area to which this section applies shall be permitted which is inconsistent with the laws for the protection of fish and game of the State in which such area is situated. All moneys received for leases or privileges shall be deposited in the Treasury of the United States as miscellaneous receipts." [Emphasis added.]

We conclude that recreational development is an allied purpose within the meaning of Public Law 14 and that the Secretary of the Army was authorized to devote some areas of the Benbrook project to such a purpose. His action in so doing may not therefore invalidate the taking.

## II.

■ The district court held in the alternative that the entire taking was not authorized by Congress and was therefore invalid. Since the landowner did

not choose to contest the taking of the 560 acres below elevation 697.1, the result of this determination was identical to the result of the district court's first holding: title to the land above elevation 697.1 was given to the Estate of Sid W. Richardson, and title to the land below elevation 697.1 was awarded to the government.

The district court apparently based its holding that the entire taking was invalid on the fact that the dam as built differed significantly from the plans contained in H.D. 403 which were approved by Public Law 14. Concluding that as a result of these deviations the Benbrook Dam and Reservoir as built was not authorized by Congress, the court held that all of the lands taken for the purpose of building and operating the Benbrook project were taken without authority from Congress and that the entire condemnation was therefore invalid. This was error.

The source of the trial court's misconception is found in the finality and binding effect which it gave H.D. 403. The plans in that document were never intended to be the final plans for the Benbrook project. The cover letter of the document itself states that it is a *"preliminary examination and survey"* (emphasis added). The report of the Chief of Engineers contained in H.D. 403 states that he recommends the project "generally in accordance" with the plans contained in the report *"as modified herein, and with such future modifications thereof as in the discretion of the Secretary of War and the Chief of Engineers may be advisable"* (emphasis added).[3] The plans in H.D. 403 could not therefore have been intended by Congress to be the final plans for the project. The House Document was only a preliminary feasibility report and was not binding on the Corps or the Secretary of the Army. Thetford v. United States, 10 Cir.

1968, 404 F.2d 301. In fact the evidence shows that it was only after passage of H.D. 403 that the Corps was empowered to make some of the most important tests and surveys to determine the type and size of the dam necessary for the area, and it was almost a year later before a Definite Project Report was submitted by the Corps. The modifications indicated in the Definite Project Report and used by the district court to support its finding of no authorization were changes in design which were considered to be necessary after the final tests and surveys were made.

It has long been the custom of Congress to approve projects of this nature on the basis of such preliminary plans and to authorize the Chief of Engineers to make such modifications as later studies indicate are necessary. In 1946 the House Committee on Rivers & Harbors explained:

> "Similarly, it has been the policy of the Flood Control Committee and the Congress to recognize that changing conditions often make plans obsolete, and to avoid undue rigidity they have given the Secretary of War and the Chief of Engineers the authority to modify plans as may be found necessary and desirable. The committee finds that this confidence and responsibility has been carefully exercised, and that modifications approved by the Chief of Engineers and the Secretary of War are only those which are clearly within the established policies of the Congress." House Committee on Rivers & Harbors, H.R.No.2165, 79th Cong.2d Sess. (1946).

In Ryan v. Chicago, B. & Q. R. Co., 7 Cir. 1932, 59 F.2d 137, the court evaluated language almost identical to that used in H.D. 403. The court there held that the Corps of Engineers was authorized to implement dam size modifications which departed from the legislatively

---

3. The title of the Secretary of War was changed to Secretary of the Army by § 205 of the National Security Act of 1947, 61 Stat. 495.

approved preliminary plan since Congress had sanctioned "such modification thereof as in the discretion of the Chief of Engineers may be advisable."

We conclude that the Secretary of the Army and the Chief of Engineers were authorized to deviate from the plans in H.D. 403. Therefore the fact that Benbrook Dam and Reservoir as actually built was approximately three miles away from the site suggested in H.D. 403, was considerably larger, and was significantly more costly did not deprive the Secretary of the Army of the authority to build the dam. United States v. Bowman, 7 Cir. 1966, 367 F.2d 768. It is undisputed that the Congressional authorization was for a flood control project on the Clear Fork of the Trinity River. This is what the Corps of Engineers built. The area served and the project purposes were not changed. The dam is on the Clear Fork and it takes no safari to locate the project when guided by its historiography. The consummated project was vicinal to the original preliminary plans for the Benbrook project. Mere changes in the plans and specifications of the Dam and Reservoir did not render arbitrary and capricious the discretion exercised by the Secretary of the Army and the Chief Engineer pursuant to H.D. 403. Nor did such changes render their actions without authority. In projects of this sort there is a built-in margin for error, leaving room for necessary changes. We hold therefore that the project as built was authorized by Congress in Public Law 14 even though it did not conform exactly to the plans contained in H.D. 403. The condemnation of the entire area involved in the present case was thus authorized by Congress.

The judgment of the district court is reversed, title to the entire 1,207 acres of land is vested in the United States, and the cause is remanded for a determination of just compensation and for other proceedings not inconsistent with this opinion.