UNITED STATES of America, Plaintiff,

v.

49.79 ACRES OF LAND, More or Less, SITUATE IN NEW CASTLE COUNTY, STATE OF DELAWARE; Frederic A. Potts and Company, Inc., a New York corporation; Getty Pipeline, Inc., a Delaware corporation; Citibank, N.A.;. Nordic Bank Limited; Sunset Strippers of Virginia, Inc.; Freedom Energy Corp.; Attorney General, State of Delaware; Finance Department, Treasury Division Collection Unit of New Castle County; City Treasurer, City of Wilmington; and unknown owners, Defendants.

Civ. A. No. 82–732.

United States District Court, D. Delaware.

Sept. 29, 1983.

Joseph J. Farnan, Jr., U.S. Atty., Peggy L. Ableman, Asst. U.S. Atty., Wilmington, Del., and Gary M. Peterson, Dept. of Justice, Washington, D.C., for plaintiff U.S.

Aubrey B. Lank and John G. Mulford of Theisen, Lank, Mulford & Goldberg, P.A., Wilmington, Del., for defendant Frederic A. Potts and Co., Inc.

Stephen E. Herrmann, Jr., of Richards, Layton & Finger, Wilmington, Del., for defendant Getty Pipeline.

J. Calvin Williams, Deputy Atty. Gen., Dept. of Justice, Wilmington, Del., for defendant State of Del.

Julianne E. Hammond, Asst. City Sol., Wilmington, Del., for defendant City of Wilmington.

## MEMORANDUM OPINION

LATCHUM, Chief Judge.

This is a civil action instituted on November 12, 1982, by the United States of America, on behalf of the Corps of Engineers ("Corps") pursuant to its power of eminent domain to take a fee simple title to 49.79 acres of land from the defendant, Frederic A. Potts and Company, Inc. ("Potts"). Pursuant to an *ex parte* Order of Possession entered November 18, 1982, Potts was required to surrender possession of the 49.79 acres. On April 8, 1983, Potts filed its answer and counterclaimed for just compensation as to 237.213 acres of land. Potts also raised five affirmative defenses. On July 7, 1983, Potts filed a motion to set aside the Order of Possession. In addition, Potts filed a motion for summary judgment on its fourth and fifth affirmative defenses which allege that the taking of the property is an acquisition of said property for the Delaware Solid Waste Authority and that acquisition by means of a lease and not by means of a fee simple condemnation would be the proper and legal method for acquiring the property.

## I. FACTS

In this action, the Corps seeks to acquire in fee 49.79 acres of land known as Cherry Island which is owned by defendant Potts. In 1975, Potts acquired 237.213 acres of land north of the Christiana River and west of the Delaware River. Potts' property consists of 49.79 acres west of the high water mark of the Delaware River as determined by an 1899 survey and 187 acres of land eastward from the high water mark to the bulkhead line of the Delaware River. In 1902, a bulkhead line along the Delaware River was established by a map approved by the Secretary of War. The establishment of the bulkhead line permitted the littoral owners to fill in with earth, stones or other material, the area between the bulkhead line and the 1902 high water mark.

The defendant Potts, in its brief, argues that although the line for the bulkhead was established in 1902, the bulkhead was not completed until sometime between 1924 and 1932—no records are available to show the exact dates of construction. The defendant also concedes that the United States had the right to use the space be-

tween the bulkhead line and the high water mark for the deposit of dredge materials taken from the channel of the Delaware River. Although the defendant noted that the United States Government has continued to use this area to the present date, for depositing dredge materials, the facts do not indicate when this operation began. At the present time, the land behind the bulkhead has been filled to the height of 44 feet.

In its brief, Potts argues that when it acquired the land on Cherry Island in 1975, a portion of the land west of the high water mark as it existed in 1902 had been leased to the Corps as a disposal site. In April of 1981, the Delaware Solid Waste Authority ("the Authority") informed Potts of its desire to use Cherry Island as a landfill. Even though the leases were extended to December 31, 1982, the Corps notified Potts on August 5, 1982 that the United States was going to condemn 49.79 acres west of the 1902 high water mark in fee simple.

On November 12, 1982, the Government filed a complaint in condemnation for the 49.79 acres. Simultaneously, the Government deposited the sum of $336,100.00 in the registry of the court as estimated compensation. By filing a declaration of taking, the fee simple title to the 49.79 acres of land vested in the United States. On November 18, 1982, an Order of Possession was signed granting immediate possession to the Government.

Since the filing of the action, the Authority, on March 31, 1983, selected a portion of the Potts property as the new landfill facility for Northern New Castle County. In addition, the Authority advised Potts that in the event the United States should either abandon its current condemnation proceedings or not complete the condemnation successfully, the Authority will acquire by condemnation Potts' entire parcel of land.

Potts argues that just compensation should be paid by the United States for the entire 237.213 acres because that is the total amount of the land actually used by the Corps. The Corps contends that the 187 acres between the bulkhead line and the 1902 high water mark are subject to its dominant navigational servitude pursuant to the Rivers and Harbors Act of 1899. 33 U.S.C. § 403 (1976). As a result, the Corps claims that it is under no obligation to pay for any of the 187 acres east of the high water mark because it will be used as a spoil area for the deposit of dredge materials removed from the channel of the Delaware River.

## II. DISCUSSION

Generally, Congressional authority to condemn land for public use is conferred by general statutes. *United States ex rel. T.V.A. v. Welch,* 327 U.S. 546, 66 S.Ct. 715, 90 L.Ed. 843 (1946). Therefore, it is the function of Congress to decide what type of taking is "public." Then the authorized entity may do so to the full breadth of its authority. *Id.* Although this is a discretionary matter for Congress, it may be delegated. *United States v. Threlkeld,* 72 F.2d 464 (10th Cir.), *cert. denied,* 293 U.S. 620, 55 S.Ct. 215, 79 L.Ed. 708 (1934). By the Act of April 24, 1888, 25 Stat. 94, 33 U.S.C. § 591 (1974), Congress conferred upon the Secretary of the Army the authority to condemn land to "maintain, operate or prosecute works for improvement of rivers and harbors for which provision has been made by law." *United States v. Bowman,* 367 F.2d 768, 770 (7th Cir.1966). The power granted under 33 U.S.C. § 591 (1976) is unlimited and discretion is clearly vested in the Secretary of the Army to determine the size and amount of the taking. *United States v. 10.08 Acres of Land,* 46 F.Supp. 138 (M.D. Pa.1942).

Pursuant to 33 U.S.C. § 403, the Secretary of the Army had the authority to establish harbor lines beyond which no piers, bulkheads, or other works shall be extended or deposits made. The Secretary exercised that authority in 1902 when the bulkhead line was established by a map approved by the Secretary of War. Subsequent to the establishment of the bulkhead line in 1902, the State of Delaware enacted legislation permitting the littoral owners to

fill in the area between the bulkhead line and the high water mark. 23 *Del.C.* § 1508 (1981).

It is important to note the breadth of the Secretary's power under 33 U.S.C. § 591. Courts, which have been faced with this issue, have declined to read into the powers granted by the 1888 Act any limitations not indicated by Congress. *United States v. Meyer*, 113 F.2d 387 (7th Cir.), *cert. denied*, 311 U.S. 706, 61 S.Ct. 174, 85 L.Ed. 459 (1940). The only limitations Congress has expressly provided for are three: (a) that the Secretary institute condemnation proceedings for the acquisition of land, right-of-way, or material for the improvement of rivers and harbors; (b) that the owner of such land, right-of-way, or material receive reasonable compensation; and (c) that the proceedings be prosecuted in accordance with the laws of the state wherein the proceedings may be instituted. 33 U.S.C. § 591.

■ The substance of Potts' first argument is that the land acquired by the United States Government's condemnation was not acquired for "public use" and that the power of condemnation was exercised arbitrarily, capriciously and in bad faith. (Docket Item ["D.I."] 24, at 15, 16.) Pursuant to 33 U.S.C. § 591, the Secretary of the Army is vested with the authority to cause proceedings to be instituted in the name of the United States for the acquisition by condemnation of any land or material for the purpose of improving the rivers and harbors. *Harwell v. United States*, 316 F.2d 791 (10th Cir.1963). Potts argues that the effect of this condemnation is not for the purpose of maintaining or improving navigation in the Delaware River but for the purpose of conveying piecemeal the entire 237.213 acres to a state authority, the Delaware Solid Waste Authority. (D.I. 24, at 19.)

■ The general rule is that private property can constitutionally be taken by eminent domain only for a "public" use. *United States v. 0.16 Acres of Land*, 517 F.Supp. 1115 (E.D.N.Y.1981). As a result, in a condemnation proceeding, the only inquiries for judicial review are whether the expressed use is, in fact, a public one, *Shoemaker v. United States*, 147 U.S. 282, 13 S.Ct. 361, 37 L.Ed. 170 (1893), and whether the condemnation results from bad faith or arbitrary and capricious motives. *United States v. Carmack*, 329 U.S. 230, 67 S.Ct. 252, 91 L.Ed. 209 (1946). In the absence of egregious bad faith, if the use is a public one, the necessity for the designated property is not open to judicial review. *Berman v. Parker*, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954).

> In such circumstances the judiciary may not substitute its judgment for that of the Corps of Engineers. There is an administrative assertion by the Secretary of the Army that the land is necessary to the construction and operation of the project. That assertion is not so patently untenable that a reasonable person could not find an association between the project and the land. Once this determination is made the judicial function is ended and the declaration of taking must be sustained.

> Judges are expected to be wise in their judicial dispensations and learned in the law, but it must be conceded that they are not hydrographers, reclamation engineers, meteorologists, or informed in the art of geodetics. Congress has wisely committed to the expert their spheres of expertise, in this instance the Corps of Engineers under the supervision of the Secretary of the Army. The court should not and may not interfere with the exercise of the discretion given to these experts.

*United States v. 2,606.84 Acres of Land*, 432 F.2d 1286, 1290–91 (5th Cir.1970).

In the present case, Potts concedes that the "purpose" of the condemnation is a valid public use. (D.I. 24, at 16.) Additionally, Potts concedes that the United States needs portions of the Cherry Island property until at least 1986 but Potts argues that instead of taking a fee simple interest, a leasehold would be more appropriate. (D.I. 24, at 15.) Potts further contends that the United States exceeded its statutory au-

thority by condemning a fee interest when it would not always need the entire fee because the dredge materials cannot be deposited above an elevation of 50 feet. (*Id.*)

The argument that a fee simple title is not necessary to accomplish the purposes contemplated by the legislation is frequently made in condemnation cases. However, it has been unanimously rejected by every court which has considered the issue. *United States v. 2,606.84 Acres of Land,* 432 F.2d 1286 (5th Cir.1970); *West, Inc. v. United States,* 374 F.2d 218 (5th Cir.1967); *Wilson v. United States,* 350 F.2d 901 (10th Cir.1965).

 The only exception to the general rule of no judicial interference occurs when:

> [T]he delegated official so overstep[s] his authority that *no* reasonable man could conclude that the land sought to be condemned had *some* association with the authorized project.... There must be basic to the project pervasive deception, unreasoned decision or will-of-the-wisp determination before the words of pejoration are brought into play.

*United States v. 2,606.84 Acres of Land,* 432 F.2d at 1290 (emphasis added). In the present case, the land sought to be condemned is reasonably related to the authorized spoil area project. The 49.79 acres are contiguous to the high water mark and the area currently being used for deposit of dredge materials. In addition, when Potts acquired the property in 1975, the 49.79 acres west of the high water mark were leased to the Corps as a disposal site. As a result, there is no evidence from which this Court could conclude that the 49.79 acres west of the high water mark were so disassociated with the deposit of dredge material so as to render the taking arbitrary or capricious. *See United States v. Carmack,* 329 U.S. 230, 67 S.Ct. 252, 91 L.Ed. 209 (1946). In its brief, Potts concedes that the property subject to the condemnation is necessary to the United States Government but only until 1991. (D.I. 24, at 20.)

 Although Potts alleges bad faith on the part of the Corps, the facts do not support this position. To allege bad faith a party must charge facts rather than conclusions, and such facts must suggest actual malevolence by the officer towards the complaining party. *United States v. 40.75 Acres of Land,* 76 F.Supp. 239 (N.D.Ill. 1948). Even though there are some statements to indicate that the United States Government sought a fee simple title so that it could convey the property to the Delaware Solid Waste Authority, this does not suggest malevolence on the part of the Government. There is nothing in Potts' allegations of the Corps indicating actual malevolence or spite directed toward them by the Corps and being the Corps' real reason for taking the land.

 Once the objective is within the authority of Congress, the means by which it will be accomplished is also the prerogative of Congress. *Berman v. Parker,* 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954). In *Berman,* the Court noted that it was not necessary that land taken for a public purpose remain in United States' ownership. 348 U.S. at 33–34, 75 S.Ct. at 102–103. Nor is it for the courts to consider allegations that the public use to be served is merely a disguise to mask arbitrary official conduct. *United States v. 416.81 Acres of Land,* 514 F.2d 627 (7th Cir.1975).

 Potts further contends that the monetary deposit made by the Corps should have been calculated based on 237.-213 acres of land and not 49.79 acres. This issue is not reached by this Court. The court is not permitted to "oversee the choice of the boundary line nor to sit in review of the size of a particular project." *Berman v. Parker,* 348 U.S. at 35, 75 S.Ct. at 104.

The statute itself is clear. It provides that the declaration of taking contain a statement of the sum of money "estimated by said acquiring authority to be just compensation for the land taken." Congress plainly gave the acquiring authority, not the courts, the function of estimating just compensation for this pur-

pose. And the lack of court review is evident from the fact that when the declaration is filed and the deposit made in court "title to the said lands * * * shall vest in the United States of America, and said lands shall be deemed to be condemned * * *." Had Congress intended court review of the declaration or the amount of the estimate it would have provided for some court action by way of approval before title passed. It did not require any court action in this particular. Likewise, because it did not contemplate any court action, it made no provision for response by the condemnee or even for notice prior to vesting of title. *In re United States of America Praying for a Writ of Mandamus or Writ of Prohibition,* 257 F.2d 844, 849–50 (5th Cir.), *cert. denied sub. nom. Certain Interests in Property in Hillsboro County, Florida v. United States,* 358 U.S. 908, 79 S.Ct. 234, 3 L.Ed.2d 228 (1958). *See also United States v. 101.88 Acres of Land,* 616 F.2d 762 (5th Cir.1980).

The substance of Potts' second argument is that the United States has waived or surrendered its claim for a navigational servitude in the area to the east of the high water mark as established in 1902. It is the landowner's contention that the Corps had a navigational servitude once, but the Corps has subsequently lost that privilege due to the construction of the bulkhead and the filling in behind the bulkhead making that area inaccessible to navigation. However, the Corps has used the area behind the bulkhead as a spoil area to aid navigation and so the servitude has not been lost.

 It is a well settled rule that the owner of the bed of a navigable river holds his title subject to the government's right to control and regulate the navigable waters in the public interest. *Lewis Blue Point Oyster Cultivation Co. v. Briggs,* 229 U.S. 82, 33 S.Ct. 679, 57 L.Ed. 1083 (1913). This Court does not question the proposition that the United States Government has the conferred absolute authority pursuant to the commerce clause to control and regulate all navigable waters in the

United States in the interest of commerce. Stemming from that power is the dominant navigational servitude which extends to all areas below the mean high water mark. *Borax Consolidated, Ltd. v. Los Angeles,* 296 U.S. 10, 26, 56 S.Ct. 23, 31, 80 L.Ed. 9 (1935). In this case, the facts indicate that all of the land involved in the navigational servitude is situated within the area of the riverbed as it existed in 1902.

 It is Potts' position that, even though the area east of the high water mark of 1902 will be used for a spoil area for a few years, the real purpose concerns the conveyance to the Authority. However, this collateral purpose will not invalidate the exercise of the dominant navigational servitude. The fact that collateral purposes other than navigation will also be served does not invalidate the exercise of the authority conferred, even if those other purposes, standing alone, would not have justified an exercise of legislative power. *Arizona v. California,* 283 U.S. 423, 51 S.Ct. 522, 75 L.Ed. 1154 (1931). Therefore, as long as the land subject to the servitude is a result of the government's dredging activity and it is needed for a purpose beneficial to commerce, even if navigation is somewhat impaired, these lands remain subject to the dominant servitude. The fact that the lands between the bulkhead line and the high water mark of 1902 are no longer navigable, is of no legal consequence. *See United States v. 1,629.6 Acres of Land,* 503 F.2d 764 (3d Cir.1974).

As the Court of Claims stated in *Allen Gun Club v. United States,* 180 Ct.Cl. 423, 430 (1967):

The navigation easement enables the Government, under the commerce clause, to employ submerged lands under navigable water for a variety of purposes helpful to commerce, including flood control. [Citation omitted.] The works herein * * * may have impaired navigation * * *; indeed, the Army Engineers seem to expect to fill the entire Bay with silt eventually, except for the one clear channel. But the * * * [Army Engineers] may, without Fifth Amendment

liability, employ land submerged under navigable water in the way that in their best judgment helps to accomplish the overall purpose even if, intentionally or not, they impair navigation for some purposes in some areas. *United States v. Commodore Park, Inc.*, 324 U.S. 386 [65 S.Ct. 803, 89 L.Ed. 1017] (1945) * * * *Gibson v. United States*, 166 U.S. 269 [17 S.Ct. 578, 41 L.Ed. 996] (1897) * * *.

Pursuant to the passage of the Rivers & Harbors Appropriation Act of 1899, the Secretary of the Army was given jurisdiction over all of the navigable waters of the United States. 33 U.S.C. §§ 401–65 (1976). In 1972, a new definition of "navigable waters" was adopted which states:

> (C) General Definition—navigable waters of the United States are those waters which are presently, or have been in the past, or may be in the future, susceptible for use for purposes of interstate or foreign commerce. A determination of navigability once made, applies laterally over the entire surface of the water body, and is not extinguished by later actions or events which impede or destroy navigable capacity.

33 C.F.R. § 209.260 (1972).

As of 1899, the high water mark of the Delaware River in front of the subject property is the same as was set forth by the War Department map of February 9, 1901. The map proposed pierhead and bulkhead lines, which were approved by the Assistant Secretary of War on November 7, 1902. Such approval stated:

> (1) that no material shall be deposited between the bulkhead line and the present existing high water line, except when the method, amount, time and place of deposit are approved by the Engineering Officer in charge of the improvement of the Delaware River.

■ Potts argues that in 1932 the area between the bulkhead line and the high water mark was completely filled in by the government dredging operations. (D.I. 24, at 25.) Thus, at that point, Potts argues that it was not navigable therefore it was not subject to any dominant navigational servitude. *Id.* The law, however, is clear that since the Government originally controlled the land under the navigable water, it could not lose control of that property because the area is no longer actually navigable. *United States v. 1,629.6 Acres of Land*, 503 F.2d 764 (3d Cir.1974).

■ As authority for the proposition that the United States Government has surrendered or abandoned its navigational servitude, Potts cites *United States v. Stoeco Homes, Inc.*, 498 F.2d 597 (3d Cir.1974), and *United States v. 119.67 Acres of Land*, 663 F.2d 1328 (5th Cir.1981). These two cases are factually distinguishable and inapplicable to the present case. Both cases involved the United States Government taking positive steps to either give a permit to a third party to perform the dredging operations or stipulating that the filled land would be exempt from the taking. Additionally, neither case involves the United States Government performing the dredging operations. In the case at bar, the Government performed the dredging operations and it has taken no action concerning the navigational servitude. Potts' argument that due to the Government's inaction, the navigational servitude has been surrendered, is therefore unfounded.

Accordingly, this Court finds that the area between the high water mark and the bulkhead line emerged as a result of dredging operations performed by the United States Government, that the Government remains in control of the land below the 1902 high water mark and that the riparian owner's title to the surfaced lands remains subordinate to the dominant navigational servitude. Furthermore, this Court finds that the condemnation was for a public purpose and that the Secretary of the Army's decision to condemn the 49.79 acres in fee simple was not arbitrary, capricious, or in bad faith.

The defendant's motions to set aside the order of possession and for summary judgment will be denied.