NATIONAL RAILROAD PASSENGER CORPORATION, A District of Columbia Corporation, Plaintiff-Appellee,

v.

TWO PARCELS OF LAND ONE 1691 SQ. FOOT MORE OR LESS PARCEL OF LAND IN the TOWN OF NEW LONDON, COUNTY OF NEW LONDON and STATE OF CONNECTICUT; And One 2548 Sq. Foot More or Less Parcel in the Town of New London, State of Connecticut; Eliot Hagar, Defendants,

Eliot Hagar, Defendant-Appellant.

No. 667, Docket 86–7831.

United States Court of Appeals, Second Circuit.

Argued Jan. 26, 1987.

Decided June 30, 1987.

Emmet L. Cosgrove (Waller, Smith & Palmer, P.C., New London, Conn., of counsel), for plaintiff-appellee.

Joseph E. Moukawsher, New London, Conn., for defendant-appellant.

Before OAKES, MESKILL and MAHONEY, Circuit Judges.

MAHONEY, Circuit Judge:

In this condemnation action, Eliot Hagar, a New London landowner, appeals from (1) an order of the United States District Court for the District of Connecticut (Constance Baker Motley, Chief Judge, sitting by designation) denying Hagar's motion for summary judgment and granting plaintiff National Railroad Passenger Corporation's cross-motion for summary judgment on the issue whether plaintiff was authorized to condemn Hagar's property; and (2) an order of the same court (T. Emmet Clarie, Judge) denying Hagar's motion for a new trial premised upon the grounds that (a) the court erred in refusing to apply state law in resolving the question of just compensation, and (b) the jury returned a quotient verdict.

We affirm.

## BACKGROUND

At all relevant times, defendant Hagar was the owner of two parcels of realty located in the City of New London, Connecticut. Both are separated from the nearby Thames River by the railroad tracks of the National Railroad Passenger Corporation ("Amtrak"). The parcels are improved by buildings.

On March 18, 1982, Amtrak filed a declaration of taking and complaint in the United States District Court for the District of Connecticut seeking to condemn portions of Hagar's properties as part of a plan aimed at "realignment and construction of track and construction of a new moveable-span bridge over the Shaws Cove outlet in New London." Brief of Amtrak at 1. Hagar's properties were but two of several sought by Amtrak.

In the course of discovery, Hagar was permitted to examine an agreement dated July 1, 1982 among the Federal Railroad Administration ("FRA"), the City of New London and Amtrak (the "Agreement"). The Agreement set forth the rights and responsibilities of the parties respecting a "joint hurricane protection barrier/railroad embankment project." Section 202 of the Agreement required Amtrak to "take all actions necessary, in cooperation with FRA, whether by negotiated purchase or by condemnation, to acquire the property interests that are required for the Joint and Bridge Projects." Section 301 of the Agreement required Amtrak, within specified time constraints, to "convey to the City [of New London], by quitclaim deed, all of Amtrak's right, title and interest in (1) certain portions of the parcels acquired under section 202...." Section 501 provided that "[t]he City intends to construct [a] Service Road following conveyance to the City of all properties to be conveyed to the City for the Service Road under Article III [including section 301]...."

Amtrak reserved certain rights in the conveyances. For example, under section 604 of the Agreement, New London granted Amtrak a permanent easement

to all lands to be conveyed to the City under this Agreement, and also to all lands now held or hereafter acquired by the City between Shaw's Cove and Captain's Walk and extending fifty feet in either direction from the property boundaries of the relocated railroad right-of-way, for the following purposes:

(a) inspection, maintenance and repair of adjacent railroad facilities;

(b) inspection, maintenance and repair of the hurricane protection barrier as it may affect railroad facilities and operations;

(c) railroad drainage and utility requirements;

(d) rescue and salvage operations required in connection with a railroad emergency; and

(e) open, uninterrupted, and continuous pedestrian and automobile access to and egress from Amtrak's Shaw's Cove Bridge by Amtrak operation and maintenance personnel.

Amtrak shall only exercise such rights at reasonable times and in a reasonable manner, and only after reasonable prior notice to, and acknowledgment of receipt by, the City; except that no such prior notice shall be required in connection with routine bridge tender access to and egress from the Shaw's Cove Bridge. Except as otherwise expressly provided, any exercise of the rights described in this section shall be at Amtrak's sole expense. The rights granted by the City under this section shall not be construed as a waiver of any permit requirements imposed by local law.

Although Amtrak's complaint in condemnation purported to seek Hagar's properties "to accomplish the realignment and construction of track and a new moveable-span bridge," the exhibits to the complaint described the subject properties as part of a "Service Road Acquisition."

Based on the complaint and Agreement, Hagar surmised that Amtrak was condemning property

for the purpose of reconveying it to the City and the City would construct a public street approximately one mile long behind the buildings on Bank street and running parallel to the railroad right of way. The purpose of the road was to provide access to the rear of the buildings on Bank street, to relieve traffic on Bank street, and to provide greater access to water front dock facilities in the area.

Brief of Hagar at 5–6.

On August 21, 1985, Hagar moved for summary judgment, claiming that since Amtrak sought to condemn his land for the purpose of conveying it to New London for the latter's use as a public street, it exceeded its power of eminent domain under 45 U.S.C. § 545(d) (1982). Amtrak cross-moved for summary judgment. In an unreported memorandum opinion dated October 15, 1985, Chief Judge Motley denied Hagar's motion and granted Amtrak's cross-motion, holding that (1) Amtrak enjoys broad discretion in the exercise of its eminent domain power and a "valid exercise of discretion by a governmental body" should not be disturbed by the judiciary unless the official action is patently unreasonable; and (2) Amtrak's proposed conveyance of condemned properties to New London would constitute a "subordinate use, since the majority of the property condemned by Amtrak will be used for the construction of the tracks and moveable span bridge." Hagar attempted an appeal of Chief Judge Motley's order, but the appeal was dismissed as premature by another panel of this court.

The matter proceeded to a trial by jury before Judge Clarie on the issue of just compensation. Amtrak's partial taking of Hagar's property rendered the balance of both parcels nonconforming under New London zoning laws. Conn.Gen.Stat. § 48–24 (1987) requires a condemnor whose partial taking renders remaining property nonconforming to obtain a variance for the remainder prior to condemnation, or to compensate the owner for the entire par-

cel.[1] Hagar urged application of Section 48–24; since Amtrak had not obtained variances, Hagar argued that the measure of just compensation was the entire value of his parcels. Judge Clarie rejected the argument and applied federal law, which contains no requirement similar to Section 48–24.

The jury awarded Hagar $11,850 and $23,150 for the portions of the parcels taken by Amtrak. Hagar moved for a new trial on the grounds that a "quotient verdict" was rendered by the jury, and that the court had erred on its instructions to the jury regarding the applicability of Connecticut law. The motion was denied and appeal was taken to this court.

## DISCUSSION

### A. *The Legality of the Taking*

45 U.S.C. § 545(d)(1)(B) (1982) authorizes Amtrak

> to acquire any right-of-way, land, or other property (except right-of-way, land, or other property of a railroad or property of a State or political subdivision thereof or of any other governmental agency), which is required [for] intercity rail passenger service[ ] by the exercise of the right of eminent domain....

Chief Judge Motley granted Amtrak's cross-motion for summary judgment on the ground that its conveyance to New London for "construction and maintenance of the service road by the municipality" was a "valid exercise of discretion by a governmental body." Accordingly, citing and quoting *United States v. 49.79 Acres of Land,* 582 F.Supp. 368 (D. Del. 1983), Chief Judge Motley concluded that she should not disturb the decision unless "the delegated official so overstep[s] his authority that *no* reasonable man could conclude that the land sought to be condemned had *some* association with the authorized project." *Id.* at 373 (quoting *United States v. 2,606.-84 Acres of Land,* 432 F.2d 1286, 1290 (5th Cir.1970)) (emphasis added in *United States v. 49.79 Acres of Land*).

■ We agree with Hagar that the district court applied the wrong standard in reviewing Amtrak's condemnation in this case. Amtrak is not a "governmental body"; it is the creature of a statute which specifically provides that Amtrak shall not be an agency or establishment of the federal government.[2] Amtrak has not been authorized to exercise the sovereign's power of eminent domain. It has been granted a limited power, within the meaning of *United States v. Carmack,* 329 U.S. 230, 67 S.Ct. 252, 91 L.Ed. 209 (1946),[3] to condemn

---

1. Conn. Gen. Stat. § 48–24 (1987) provides:

    A condemning authority, if acquiring less than the total amount of a single unit of contiguous property, shall, if the remaining portion of such property does not conform to the area requirements of existing zoning regulations, obtain a zoning variance for such remaining portion of property from the local zoning board of appeals before condemning any portion of such property. If such variance is not obtained prior to the taking by the condemning authority, the owner or owners of such single unit of contiguous property shall be reimbursed for the total amount of such unit and the condemning authority shall take title in fee simple to the entire unit of contiguous property.

2. 45 U.S.C. § 541 (1982) provides in pertinent part that Amtrak

    shall be operated and managed as a for profit corporation, the purpose of which shall be to provide intercity and commuter rail passenger service.... The Corporation [Amtrak]

    will not be an agency or establishment of the United States Government. It shall be subject to the provisions of this chapter and, to the extent consistent with this chapter, to the District of Columbia Business Corporation Act....

3. There, the Supreme Court stated:

    In the instant case, we deal with broad language employed to authorize officials to exercise the sovereign's power of eminent domain on behalf of the sovereign itself. This is a general authorization which carries with it the sovereign's full powers except such as are excluded expressly or by necessary implication. A distinction exists, however, in the case of statutes which grant to others, such as public utilities, a right to exercise the power of eminent domain on behalf of themselves. These are, in their very nature, grants of limited powers. They do not include sovereign powers greater than those expressed or necessarily implied, especially against others exercising equal or greater public powers.

land "required [for] intercity rail passenger service." 45 U.S.C. § 545(d)(1)(B) (1982).[4]

■ Although Amtrak's exercise of its delegated power of eminent domain is entitled to less deferential review than that of a government agency, we are persuaded that Amtrak did not exceed its statutory authority in the instant case. In addition to authorizing Amtrak to acquire land by eminent domain which is "required [for] intercity rail passenger service," 45 U.S.C. § 545(d)(1)(B) (1982), Congress has established a number of goals for Amtrak, including the "[e]xercise of [Amtrak's] best business judgment in taking actions to minimize Federal subsidies," 45 U.S.C. § 501a(1) (1982), and "[e]ncouragement of State, regional, and local governments and the private sector to share the costs of operating rail passenger service, including the costs of operating stations and other facilities, in order to minimize Federal subsidies," 45 U.S.C. § 501a(2) (1982). Recognizing this, Hagar does not contend that Amtrak may not condemn property for a service road; he contends that it may not do so for the City of New London. Reply Brief of Hagar at 3.

On the facts of this case, we disagree. We see no impropriety in Amtrak's condemnation of property within the scheme of an overall cooperative agreement with New London and the FRA whereby the service road, the need for which is unchallenged, is maintained by New London. New London's grant of a permanent easement to Amtrak for inspection/maintenance purposes, the exercise of which may periodically close the road to the public, demonstrates the significant relationship between the condemned property and the provision of intercity rail passenger service. On this basis, we affirm the district court's grant of Amtrak's cross-motion for summary judgment. *See Sadlowski v. United Steelworkers of America*, 645 F.2d 1114, 1120 (D.C. Cir.1981), *rev'd on other grounds*, 457 U.S. 102, 102 S.Ct. 2339, 72 L.Ed.2d 707 (1982) (appellate court may uphold summary judgment under legal theory different from that applied by trial court); 10 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2716, at 657–60 (1983) (same).

### B. *The Measure of Just Compensation*

■ Both parties are in agreement that, in general, federal law governs this federal condemnation action. *See* Brief for Hagar at 28; Brief of Amtrak at 17–18. Amtrak derives its powers from federal law; it was created to "fully develop the potential of modern rail service in meeting the Nation's intercity and commuter passenger transportation requirements." 45 U.S.C. § 541 (1982). Although, as noted above, Amtrak is a corporation and not an agency or establishment of the federal government, many details of its corporate governance are prescribed by federal law;[5] it is subject to the District of Columbia Business Corporation Act only where consistent with federal law. *See id.* Thus, since Amtrak derives its authority from a "specific Act[ ] of Congress passed in the exercise of a 'constitutional function or power,'" *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726, 99 S.Ct. 1448, 1457, 59 L.Ed.2d 711 (1979) (quoting *Clearfield Trust Co. v. United States*, 318 U.S. 363, 366, 63 S.Ct. 573, 575, 87 L.Ed. 838 (1943)), here the power to regulate commerce among the several States, we think it clear that "federal interests are sufficiently implicated to warrant the protection of federal law." *Id.* 440 U.S. at 727, 99 S.Ct. at 1457 (footnote omitted).

While federal law governs Amtrak's rights and obligations in the exercise of its

---

329 U.S. at 243 n. 13, 67 S.Ct. at 258 n. 13.

**4.** Compare the broad language of 40 U.S.C. § 257 (1982), which provides in part:

> In every case in which the Secretary of the Treasury or any other officer of the Government has been, or hereafter shall be, authorized to procure real estate for the erection of a public building or for other public uses, he may acquire the same for the United States by condemnation, under judicial process, whenever in his opinion it is necessary or advantageous to the Government to do so....

**5.** *See, e.g.,* 45 U.S.C. § 542 (incorporation); *id.* § 543 (qualifications and appointment of directors and officers; bylaws; stock conversion and voting rights); *id.* § 544 (general provisions respecting common and preferred stock).

eminent domain power, it is silent respecting the measure of just compensation. Thus, the question arises whether the issue of compensation should be resolved according to a uniform federal rule or whether state law should supply the rule of decision.[6] Here the parties part company. Hagar argues that *Georgia Power Co. v. Sanders*, 617 F.2d 1112 (5th Cir.1980) (in banc), followed by this circuit in *Winooski Hydroelectric Co. v. Five Acres of Land*, 769 F.2d 79 (2d Cir.1985), requires application of Conn. Gen. Stat. § 48-24 (1987) to the question of just compensation. While we agree that the *Georgia Power* analysis is sound and should be applied to the facts of this case, we think it points to a different result.

*Georgia Power* was a condemnation action instituted under Section 21 of the Federal Power Act ("FPA"), 16 U.S.C. § 814 (1982), by a private utility acting as a licensee of the Federal Energy Regulatory Commission. The landowners' requests that the amount of compensation due them be determined in conformity with Georgia law—which would have resulted in higher awards than would be the case if federal law were applied—were denied by the district court. *Id.* at 1114–15. The in banc panel held that the source of law under 16 U.S.C. § 814 is federal, but Georgia law should be adopted as the federal rule of decision. The Fifth Circuit stated as a general rule that considerations of federalism militate in favor of adopting state law as the federal rule of decision "unless there is an expression of legislative intent to the

contrary, or, failing that, a showing that state law conflicts significantly with any federal interests or policies" present in the case under scrutiny. *Id.* at 1116 (citing the Rules of Decision Act, 28 U.S.C. § 1652 (1982), and *Wallis v. Pan American Petroleum Corp.*, 384 U.S. 63, 68, 86 S.Ct. 1301, 1304, 16 L.Ed.2d 369 (1966)). Concluding that no significant federal interest called for a uniform federal rule as to the amount of compensation to be paid where property is condemned pursuant to 16 U.S.C. § 814, the Fifth Circuit held that local law should be adopted as the federal rule on this question.

Here, the governing statute and its accompanying legislative history are silent. We must therefore inquire whether a significant conflict would exist were Connecticut law applied to determine the measure of compensation due landowners following condemnation under 45 U.S.C. § 545(d). A conflict is demonstrated where "the effect of applying state law is virtually to nullify the federal objectives." *Georgia Power*, 617 F.2d at 1118. Further, "[i]f application of state law would arguably interfere with an identifiable federal policy or interest, but not amount to a conflict which would preclude application of state law, [the court] must proceed to an examination of the relative strength of the state's interests in having its rules applied." *Id.*

While we are hesitant to say that application of Connecticut law would nullify achievement of federal objectives, we are convinced that it would subject Amtrak to

---

**6.** Amtrak contends that Hagar waived his argument respecting the applicability of state law by failing to raise it in his answer. We disagree. Fed.R.Civ.P. 71A(e) provides for waiver of "objection[s] or defense[s] to the *taking* of [a landowner's] property" which are not raised in his answer. *Id.* (emphasis added). Urging the applicability of a state rule of compensation cannot properly be characterized as an objection or defense to a taking; at the point in a condemnation proceeding where the issue of compensation arises, the taking is no longer an issue. Furthermore, Rule 71A(e) allows a landowner to "present evidence as to the amount of compensation to be paid" at the trial of the issue of just compensation "whether or not he has previously appeared or answered." *Id.* In *Government of Virgin Islands v. 19.623 Acres of Land*,

536 F.2d 566 (3d Cir.1976), cited in Amtrak's brief, the court noted that

[t]he amount to be paid, which generally does not impinge upon the public interest in a quick resolution of the government's right to condemn the land, is determined only in the second stage of the procedure.... This is wholly unlike the procedure during the first stage, when all defenses and objections must be carefully preserved.

*Id.* at 569. *See also* 12 C. Wright & A. Miller, Federal Practice and Procedure § 3048 (1973) ("The only function of the answer is to contest the right of the government to take the land.... All defenses and objections not so presented [*i.e.*, in the answer], except as to the amount of compensation, are waived.").

uncertainties and delays in the exercise of its condemnation power, thereby seriously interfering with "administration of the federal intercity rail passenger service program." Brief of Amtrak at 21. The facts before the Fifth Circuit in *Georgia Power* are easily distinguishable and reinforce our conclusion in the instant case. The FPA requires the Federal Energy Regulatory Commission to disapprove applications for projects affecting "the development of any water resources for public purposes [that] should be undertaken by the United States itself." 16 U.S.C. § 800(b) (1982). Therefore, as the Fifth Circuit noted, an authorized project requiring a licensee to condemn private property is one which "does not implicate the interests of the United States to the degree that it is thought desirable that the project be undertaken by the United States itself." 617 F.2d at 1118. The FPA licensee acts frequently "on a local scale," in contrast to the United States, which "acts [under the FPA] in the public interest on a national scale." *Public Utility District No. 1 v. City of Seattle*, 382 F.2d 666, 669 (9th Cir.1967), *cert. dismissed*, 396 U.S. 803, 90 S.Ct. 22, 24 L.Ed.2d 59 (1969).

It is obvious that Amtrak occupies a position quite different from that of a licensee under the FPA. Congress has specifically found that "modern, efficient commuter rail passenger service is important to the viability and well-being of major urban areas and to the national goals of energy conservation and self-sufficiency," 45 U.S.C. § 501(c)(1) (1982). Amtrak was created to serve national needs. It is "by its Congressional mandate and authorization national in scope. The railroad's lines and services do not confine themselves to state or county lines but traverse the entire continental United States...." Brief of Amtrak at 19.

In *Georgia Power*, moreover, resolving the question of compensation according to state law resulted solely in higher condemnation costs to FPA licensees. That would not be the case here. Under Connecticut law, a partial taking rendering excess property nonconforming under local zoning laws requires the condemnor to apply for a

variance prior to the taking; failing that, the condemnor is to reimburse the owner for the entire parcel and take title in fee simple thereto. We agree with plaintiff that application of the state rule of compensation here would place Amtrak in the unenviable position of having either to enmesh itself in the variance procedures of each locality in Connecticut where property is sought to be condemned, or to pay for entire parcels irrespective of the nexus between the property so taken and the project necessitating condemnation. Inasmuch as Amtrak is authorized only to condemn property required for intercity rail passenger service, *see* 45 U.S.C. § 545(d)(1)(B), the latter alternative under Connecticut law conflicts with an express statutory limit on Amtrak's eminent domain power.

We recognize, as did *Georgia Power*, that a state generally has an interest in "avoiding displacement of its laws in the area of property rights," *id.* at 1123; and that since state law usually governs "the question of what constitutes property," *id.*, the value of property rights is ordinarily best determined according to state law as well. Here, however, the federal interests supporting Amtrak's mission are identifiable and strong and the application of state law would "actually frustrate" federal objectives, *Georgia Power*, 617 F.2d at 1120; we accordingly hold that the district court correctly denied Hagar's motion for a new trial on this ground.

■ In any event, finally, the district court instructed the jury to determine Hagar's compensation based on the difference between the fair market values of his property before and after the taking. The jury was also instructed on severance damages; *i.e.*, it was told to take into account the dimunition in the fair market value of the property not taken attributable to the severance, and its attention was specifically directed to the zoning regulations under which Hagar's property was rendered nonconforming. The district court instructed the jury that it "must consider the effect of the zoning regulations as a factor affecting value, which any willing buyer and seller

would consider in assessing the value of the properties taken." It therefore appears that Hagar has suffered no uncompensated loss.

### C. *The Quotient Verdict*

Hagar contends that the jury rendered an improper quotient verdict; *i.e.*, that the verdict was "plainly reached after insufficient consideration of the question of just compensation, by the simple mathematical means of averaging the expert appraisals offered in the case[ ]." Brief of Appellant at 36–37.

During the trial on just compensation, the jury heard testimony from Hagar and his real estate appraiser. Hagar also called a New London zoning official to testify respecting the nonconformance of his properties following the taking. Amtrak presented its own real estate appraiser. The jury requested and was granted a chance to view the condemned properties. The jury began its deliberations late in the afternoon of July 14, 1986; it reconvened the next day and spent one hour and forty-five minutes continuing its deliberations before rendering its verdict.

■ Even assuming that Hagar's jury returned a quotient verdict, Hagar's motion for a new trial was properly denied on this point. The true quotient verdict is frowned upon because it betrays a complete absence of jury *deliberation* on the matter of an injured party's compensation. But it must be shown, for example, that the jury agreed in advance to be bound by the result of its arithmetic. *See Myra Foundation v. United States*, 267 F.2d 612, 617 (8th Cir.1959). A quotient verdict is not objectionable if, after it is determined, the jurors deliberate further and accept the result as just. *See* 6A J. Moore, Moore's Federal Practice ¶ 59.08[4], at 59–114 n. 16 (2d ed. 1986). Under these standards, Hagar asserts, but makes no showing of, impropriety.

### CONCLUSION

The orders granting plaintiff's cross-motion for summary judgment and denying defendant's motion for a new trial are affirmed.